*In re* MARRIAGE OF DANIEL J. SCHWEIHS, Petitioner-Appellant, and MELINDA SCHWEIHS, Respondent-Appellee.

First District (5th Division)   Nos. 1—94—0610, 1—94—0829 cons.

Opinion filed May 5, 1995.

654

Edwin R. Armstrong and Gregory C. Armstrong, both of Armstrong & Donnelly, Ltd., of Chicago, for appellant.

Edward T. Joyce and Rowena T. Paras, both of Edward T. Joyce & As-

sociates, P.C., and James T. Friedman and James L. Rubens, both of Davis, Friedman, Zavett, Kane & MacRae, both of Chicago, for appellee.

JUSTICE McNULTY delivered the opinion of the court:

The domestic relations court bifurcated divorce proceedings and dissolved the marriage of Daniel and Melinda Schweihs without resolving any other issues. The court then found that Daniel's interest in a lawsuit in chancery was a marital asset, and the court ordered sale of the asset to Daniel's opponents in the chancery litigation, in effect ordering a settlement of the case. Daniel appeals from the order for bifurcation in docket number 1—94—0610 and from the order for sale of the asset in docket number 1—94—0829. We find that the record shows adequate grounds for bifurcation, and the evidence supported the order for sale of the litigation interest. We state most pertinent facts in our opinion in the companion case of *Disciplined Investment Advisors, Inc. v. Schweihs* (1995), 272 Ill. App. 3d 681, due to our supreme court's limitation on the lengths of our opinions.

## I

■ Daniel contends that the orders for bifurcation and sale of the asset are void because the trial judge entered the orders after erroneously denying Daniel's motion for substitution of judges. See *Stoller v. Paul Revere Life Insurance Co.* (1987), 163 Ill. App. 3d 438, 442, 517 N.E.2d 75.

Daniel's mother, Veronica Schweihs, died in December 1990, leaving her four children an estate worth more than $400,000. In 1991, Melinda moved to add the executor of the estate as a party to the divorce case because the estate controlled assets from which Daniel could pay child support. At a hearing on September 8, 1992, on a motion for judgment on unpaid child support, the attorney for the executor of Veronica's estate told the court that other heirs sought a judgment declaring that Daniel had exhausted his portion of the estate by living in Veronica's home and using her money to support himself after her death. Judge Donegan expressed concern that Daniel might not oppose the other heirs because Melinda would get most of his share of the estate as child support. Judge Donegan said:

> "How do I know that Daniel Schweihs is going to have adequate representation in that estate so that we know that we are dealing with an arm's length transaction[?]
>
> ***
>
> *** I understand he might rollover and die ***. *** [T]hat's go-

ing to defeat the interest of the children that they may have [in] any distributive share he has ***."

Judge Donegan asked if the judge presiding over probate of Veronica's estate, Judge Teschner, knew about the past-due child support. The executor's attorney did not know. Judge Donegan indicated he would contact Judge Teschner himself.

Daniel's attorney admitted Daniel had not paid all of the ordered support but he said support should be reduced because Daniel "has no income." The attorney reported that Daniel had an "employment situation where he is receiving no income except based upon commission *** if he can put a deal together," and he had not received any income from that position.

Melinda sought enforcement of the child support order. The court answered:

"I think if you want that *** the answer is [to] file a petition to hold him in criminal contempt of court and ask for a sentence; and if you do that, we will have a criminal hearing in this division as to whether or not he should be sentenced, not coercive, punitive[,] so that he is going to be put in jail for a specific amount of time."

Daniel's attorney questioned the applicability of criminal contempt. The court said:

"I am only concerned with Daniel Schweihs rolling over playing dead and having a substantial portion of the estate wiped out to the [children's] detriment. ***

* * *

*** If he rolls over and plays dead and I find that out, he is going to jail."

To Melinda the court said:

"File your petition to hold him in direct criminal contempt of this Court. I will put him in jail."

On October 2, 1992, Judge Donegan sent a letter informing Judge Teschner that Daniel had a substantial child support arrearage and that Judge Donegan authorized Melinda to appear in the probate proceedings. He sent a copy of the letter to Melinda's attorney, but not to Daniel's attorney.

On November 23, 1992, Daniel moved for substitution of judges because of the *ex parte* communication of the letter copied to Melinda's attorney, and because Judge Donegan started the criminal contempt proceeding, saying he would put Daniel in jail.

Judge Donegan heard the motion on December 14, 1992, and said he copied the letter only to Melinda because she was the only person before him who was not already a party to the probate proceeding.

Daniel did not need a copy of Judge Donegan's letter because he had "full knowledge [of] what was taking place out there."

Judge Donegan also said his comments on contempt were his response to Melinda's request for enforcement of the child support order, and he only explained the enforcement options she had available, distinguishing punitive criminal contempt from coercive civil contempt.

Prior to January 1, 1993, the statute governing substitution of judges for cause in civil cases permitted the judge accused of prejudice to hear and decide the motion. (Ill. Rev. Stat. 1991, ch. 110, pars. 2—1001(a)(2), (e).) This court owes "extreme deference" to the trial court's determination on such motions (*People v. Mercado* (1993), 244 Ill. App. 3d 1040, 1046, 614 N.E.2d 284), because the trial court "is in the best position to determine whether it has become prejudiced" (*People v. Hall* (1986), 114 Ill. 2d 376, 406, 499 N.E.2d 1335). We will not reverse the denial of a petition for change of judges under this standard unless the trial court abused its discretion. *In re Marriage of Roach* (1993), 245 Ill. App. 3d 742, 747, 615 N.E.2d 30.

In the full context of the September 8 hearing, Judge Donegan's comments apparently meant that he would put Daniel in jail if Melinda proved criminal contempt by showing, for example, that Daniel "roll[ed] over and die[d]" in probate litigation, failing to protect his children's interests in his mother's estate. The comments are not sufficient to overcome the strong presumption that Judge Donegan correctly determined that he had not prejudged the case. (See *Hartnett v. Stack* (1993), 241 Ill. App. 3d 157, 171-72, 607 N.E.2d 703.) While Judge Donegan would have been better advised to send to Daniel's attorney a copy of the letter to Judge Teschner, we cannot say that the letter overcomes the presumption that the judge is not prejudiced, even when we consider it in light of the judge's comments in court. (See *People v. Beasley* (1982), 108 Ill. App. 3d 301, 309, 438 N.E.2d 1305.) Judge Donegan did not abuse his discretion by denying the substitution motion.

Following bifurcation Daniel moved again for substitution of judges, based on the facts alleged in his first petition for substitution, plus new counts alleging that Judge Donegan unfairly permitted attorneys for Financial Computer Services, Inc. (FCS), and Diversified Investment Advisors, Inc. (DIA), Daniel's opponents in the chancery suit, to appear in the divorce litigation, and Judge Donegan granted a scheduling motion *ex parte*.

Judge James Klein heard the motion for substitution of judges on January 18, 1994. Judge Klein found the intervention of FCS and DIA justified by their interest in the motion for approval of the sale

of Daniel's interest in the case against DIA and FCS. Judge Klein also found that the *ex parte* scheduling order did not show that Judge Donegan was prejudiced. Since the court had already rejected all other bases for the motion, Judge Klein denied the request for substitution of judges and remanded the case to Judge Donegan. Daniel argues that this decision was also reversible error which made all subsequent orders void.

After the new statute governing motions for substitution of judge went into effect on January 1, 1993, a judge facing a petition for substitution for cause needed to refer the petition to "a judge other than the judge named in the petition." (735 ILCS 5/2—1001(a)(3)(iii) (West 1992).) This court no longer owes the trial court the extreme deference appropriate under the prior statute, because the trial judge deciding the petition no longer has "unique insight into the thought processes of the judge who is alleged to be biased." (*Mercado*, 244 Ill. App. 3d at 1047.) The trial court, like any other fact finder, must weigh the evidence to determine whether the named judge showed prejudice. We find that under the revised statute, as with the similarly revised section 114—5(d) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114—5(d) (West 1992)), we now will not reverse a determination on allegations of prejudice unless the finding is contrary to the manifest weight of the evidence. See *Mercado*, 244 Ill. App. 3d at 1047.

Daniel claimed that Judge Donegan demonstrated actual prejudice by permitting attorneys for FCS and DIA to argue in court during the hearing on Joyce's petition to approve sale of Daniel's interest in the DIA litigation. Daniel fails to cite any case holding that permitting attorneys to argue in this circumstance is error or an abuse of discretion, let alone that it constitutes evidence of prejudice. Daniel conceded that the scheduling motion which the court heard *ex parte* did not affect his ability to present his case or cause him any other harm.

Judge Klein found that Daniel failed to show that Judge Donegan was prejudiced. The finding is not contrary to the manifest weight of the evidence. The trial court did not reversibly err by denying the two petitions for substitution of judges for cause, so the subsequent orders are not void.

■ Daniel separately argues that one prior order, the order dated August 12, 1991, directing Daniel to pay $2,300 per month in child support, is void for lack of notice and a hearing on the needs of the children. A court order is void if the court lacks jurisdiction of the parties or subject matter, or if the court lacks the inherent power to enter the particular order whose validity is challenged. *People v. Wade* (1987), 116 Ill. 2d 1, 5, 506 N.E.2d 954.

The court afforded Daniel notice and an opportunity to be heard on the needs of the children shortly after he filed for divorce. On March 7, 1990, the court found that the children needed support totaling $2,300 per month. Since Daniel failed to include a transcript or report of the hearing in the record on appeal, we must assume the evidence presented at that hearing justified the finding. (*In re Marriage of Naylor* (1991), 220 Ill. App. 3d 366, 371, 581 N.E.2d 25.) Daniel never alleged or proved any change in the children's needs.

The court set for hearing on August 12, with notice to the parties, Melinda's petition to force Daniel to sell marital assets to pay child support. Daniel responded in writing, then orally argued the motion. Because the assets and income of the parties, according to Daniel's sworn statements and judicial admissions, were inadequate to meet the children's uncontested needs, the court exercised its discretion under section 503(i) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/503(i) (West 1992)) to order support to come from the DIA shares and litigation in Daniel's control. The court gave Daniel the opportunity to meet the children's needs from other sources before ordering the sale, by ordering him to pay the needed support.

The court allowed Daniel ample opportunity to show other sources from which he or Melinda could meet those needs, and Daniel argued consistently that after the sale of the house and the exhaustion of the family bank accounts and his mother's estate, the family had no further assets or income, apart from the DIA shares and litigation, which could meet the children's needs. The court, with jurisdiction of the parties and the subject matter, acted well within its powers under section 503(i) in ordering, as part of the relief on Melinda's petition for sale of assets, that Daniel, who controlled the assets, had to meet the uncontested needs of the children. The August 12 order was not void. The court correctly found Daniel in arrears for failure to make the payments ordered.

## II

■ Daniel argues in docket number 1—94—0610 that the order for bifurcation must be reversed because the court decided the motion on the basis of pleadings and affidavits, without requiring live testimony. According to section 401 of the Dissolution Act, the court may enter a judgment of dissolution while reserving issues of maintenance, child custody and support, and disposition of property, upon "motion of either party and a finding by the court that appropriate circumstances exist." (750 ILCS 5/401(b) (West 1992).) This requirement "is satisfied if the record reveals: (a) that one of [the] parties

requested reservation of an issue; and (b) that appropriate circumstances existed therefor." (*In re Marriage of Fahy* (1991), 208 Ill. App. 3d 677, 693, 567 N.E.2d 552.) The statute does not require any particular source in the record for the facts showing appropriate circumstances. The trial court did not need to take live testimony concerning the undisputed statements in the affidavits prior to ordering bifurcation.

■ Melinda requested bifurcation and dissolution with reservation of all issues except temporary child support and disposition of the principal marital assets. Our supreme court has held that the court may find appropriate circumstances for bifurcation "where a party is unable to pay child support or maintenance if so ordered." (*In re Marriage of Cohn* (1982), 93 Ill. 2d 190, 195, 443 N.E.2d 541.) Daniel swore in his affidavit that he had no bank account and no employment, and his attorney judicially admitted that Daniel had no income. Melinda did not dispute Daniel's statements, and Daniel did not dispute Melinda's sworn statements regarding her resources and the continuing needs of the children.

Daniel's sworn statement and judicial admission that he had no income and no liquid assets, along with the entire court record showing Melinda's continual difficulty in obtaining any child support from Daniel, provide ample grounds for bifurcation. We affirm the judgment entered in docket number 1—94—0610.

### III

■ In docket number 1—94—0829, Daniel argues that we have jurisdiction to hear the appeal from the order of March 2, 1994, for sale of the chose in action, under Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307(a)(1)).

"Whether an order falls within the scope of Rule 307 is determined by its substance rather than its form or language. [Citations.] Because the rule is addressed only to interlocutory orders, the order appealed from must not be in the nature of a permanent injunction. [Citation.] If an injunction is permanent in nature, it is a final order appealable only under Rule 301 [(134 Ill. 2d R. 301)] or 304(a), if those rules are otherwise applicable. [Citation.] Whether the injunction disposes of the entire litigation is not determinative of its permanent or preliminary nature. [Citation.] Orders which are not limited in duration and which alter the status quo are permanent in nature." *Steel City Bank v. Village of Orland Hills* (1991), 224 Ill. App. 3d 412, 416-17, 586 N.E.2d 625.

In *Steel City* the trial court ordered the plaintiff to deed property over to the defendant. The appellate court found that the order

changed the status quo, so it could not be considered a preliminary injunction. Because the trial court did not include appropriate language to make the order appealable under Rule 304(a), the appellate court dismissed the appeal.

■ Here, the order dated March 2, 1994, similarly directs disposition of an asset in a manner that changes the status quo, so the order is not appealable as an interlocutory injunction. The trial court expressly found no just reason to delay enforcement or appeal of the order. This language makes an order appealable only if the order finally disposes of the rights of the parties on some definite part of the controversy. (*DeLuna v. St. Elizabeth's Hospital* (1992), 147 Ill. 2d 57, 76, 588 N.E.2d 1139; *McGrew v. Heinold Commodities, Inc.* (1986), 147 Ill. App. 3d 104, 108-09, 497 N.E.2d 424.) The order permitting Edward Joyce to accept Lerner and Breen's offer in the DIA litigation finally disposed of Daniel's rights in that litigation, and those rights are sufficiently separable from the remaining matters in controversy for the order to be immediately appealable. We find we have jurisdiction to hear the appeal under Rule 304(a)(1).

■ Daniel argues first that the court lacked authority to order the sale of stock and the chose in action. The Dissolution Act provides:

> "The court may make such judgments affecting the marital property as may be just and may enforce such judgments by ordering a sale of marital property, with proceeds therefrom to be applied as determined by the court." 750 ILCS 5/503(i) (West 1992).

The statute does not restrict the kinds of marital property for which the court may order a sale. Daniel admitted that the interest in the DIA litigation was marital property. The court ordered sale of this last asset only after Daniel failed to make the ordered child support payments.

We agree with Daniel that in the interest of comity the divorce court should not, in general, order sale of a chose in action. Here, however, the parties both swore that they had no other sources for meeting the needs of the family, and neither party alleged that the other had hidden assets the court could reach for child support. The parties exhausted all resources, including the family home and Daniel's inheritance, before the court ordered sale of the DIA litigation. Even then the court properly allowed Daniel to meet the children's needs any way he could, as the court ordered him to pay the child support needed. Daniel may have been able to meet the needs by obtaining a loan, perhaps using his interest in the DIA litigation as collateral. Had he done so, or in any other way provided for his children, the circumstances might not have justified the exceptional remedy of sale of the litigation interest.

We find that under the extraordinary circumstances of this case, where a chose in action is the only asset of the parties from which they can meet support obligations, the power granted in section 503(i) of the Dissolution Act is sufficiently broad to permit the divorce court, within its discretion, to order the sale of the interest in the litigation.

■ Daniel contends that the trial court deprived him of his right to litigate against Breen and Lerner without due process of law. "Procedural due process requires that a party be afforded notice and an opportunity to be heard and to conduct a defense." (*In re Marriage of Blaisdell* (1986), 142 Ill. App. 3d 1034, 1044, 492 N.E.2d 622.) Daniel received notice of the hearing to determine whether to sell the asset and the court gave Daniel a full opportunity to conduct a defense. The court provided Daniel all process due before reaching his interest in the litigation against DIA.

■ Daniel argues that the trial court abused its discretion by ordering sale of the chose in action and stock. (See *West v. West* (1979), 77 Ill. App. 3d 828, 834, 396 N.E.2d 1382.) Daniel maintains that admissible evidence did not support the trial court's conclusions because the trial court should not have accepted testimony from Edward Joyce, an undisclosed expert. The court explained that the court itself disclosed Joyce as an expert in a manner sufficient to comply with Supreme Court Rule 220(b)(1) (134 Ill. 2d R. 220(b)(1)), when it appointed Joyce expressly because of his expertise in corporate litigation. We agree that this disclosure gave Daniel sufficient notice, in accord with the purpose of Rule 220, that he should expect Joyce to express his expert opinion regarding the value of the DIA litigation. See *Sohaey v. Van Cura* (1994), 158 Ill. 2d 375, 381-82, 607 N.E.2d 707.

■ Daniel argues that the court should not have allowed Joyce to testify because he was attorney for the children, and his testimony affected their interests. (See *Stach v. Sears, Roebuck & Co.* (1981), 102 Ill. App. 3d 397, 405-06, 429 N.E.2d 1242.) The trial court may, in its discretion, permit an attorney for a party to testify. (*In re Marriage of Lee* (1985), 135 Ill. App. 3d 509, 516, 481 N.E.2d 1045.) The trial court here permitted Joyce to testify because it appointed Joyce to evaluate the DIA litigation and report to the court. We find no abuse of discretion in permitting Joyce to testify. See *People v. Beals* (1994), 162 Ill. 2d 497, 643 N.E.2d 789 (conviction affirmed although defendant's attorney testified by stipulation that defense witnesses' out of court statements contradicted their trial testimony).

■ Daniel contends, without citation to authority, that the court abused its discretion by sustaining objection to his questions regard-

ing activities of Don Berland. We do not address the argument because "[a] point not argued or supported by citation to relevant authority *** is *** waived." *Brown v. Tenney* (1988), 125 Ill. 2d 348, 362, 532 N.E.2d 230.

■ The court found, on the basis of Joyce's testimony and the exhibits, including the entire record of the DIA litigation, that the best interests of the children required sale of the DIA litigation interest on the terms of the offer. As this is a factual finding of the trial court, we will not reverse the finding unless it is contrary to the manifest weight of the evidence. See *State Farm Mutual Automobile Insurance Co. v. Dreher* (1989), 190 Ill. App. 3d 182, 184-85, 547 N.E.2d 1.

Joyce relied primarily on the book value of Daniel's stock as a measure of its value although he admitted that in most circumstances book value has only a tangential relationship to fair market value of stock. Joyce explained that if DIA had long-term contracts for the work of Lerner and Breen, it would have substantially greater value, more in line with the offers from La Salle National Bank and United Asset Management (UAM). La Salle offered $5.2 million for Daniel's shares, and UAM offered $16.25 million for the entire company, leaving $5.4 million for Daniel's shares, but both made their offers contingent upon DIA obtaining long-term employment contracts with Lerner and Breen. UAM expressly said that without such contracts it would offer nothing for the corporation. Since Lerner, Breen and the stock selection programs were DIA's principal assets, Joyce believed that the long-term contracts with Lerner and Breen supplied the bulk of the value for the purchase offers. Daniel admitted that DIA had no long-term contracts with Lerner or Breen, and both could stop working for DIA at any time. This possibility also substantially undercut Price Waterhouse's evaluation of the company based on its cash flow: DIA produced that cash flow only because Lerner and Breen supplied the updated stock selection programs DIA's clients wanted. Joyce considered all relevant factors (see *Stanton v. Republic Bank* (1991), 144 Ill. 2d 472, 479, 581 N.E.2d 678) and gave credible reasons for finding Daniel's shares worth only $400,000 to $500,000.

Joyce found that even if Daniel received all the relief he requested in the shareholders' derivative action he would receive no more than $3.2 million. While Daniel optimistically applied a lower tax rate to support a value of almost $3.7 million, either figure overstates the probable value of the derivative suit. The bulk of the money Daniel asked FCS to return to DIA came from the payments to FCS of one-half of DIA revenues and Daniel expressly agreed to that pay-

ment in the document establishing DIA. His only argument for the return of more than $12 million from FCS is that the final clause of the agreement permits DIA to purchase for $1 all FCS programs plus all updating services for those programs and any new programs FCS generates, in perpetuity. If the chancery court rejected that construction of the agreement, Daniel would lose more than half of his projected maximum value for the derivative claim.

Daniel argues that his right to appeal from summary judgment on seven of the eight counts of his complaint was worth millions of dollars, and Joyce incredibly assigned to that right of appeal no substantial value. In particular, Daniel claims that his claim for breach of fiduciary duty to him was likely to succeed. Daniel alleged in the DIA litigation that Lerner and Breen breached Daniel's employment contract and their fiduciary duties to Daniel by firing him and failing to continue to pay him under his employment contract. The trial court granted summary judgment because the employment contract was terminable at will and its payment provisions no longer applied following Daniel's termination. The court also found that the undisputed facts showed that Daniel's misconduct justified the firing. Daniel does not contest the finding of at-will employment or misconduct, so he has shown no likelihood of proving that Lerner and Breen breached fiduciary duties personal to Daniel.

Daniel argues that all breaches of fiduciary duty to DIA were also breaches of fiduciary duties to him. Illinois courts have distinguished the duties an officer of a close corporation owes to the corporation from the duties the same person owes as shareholder to other shareholders in the corporation. Where a shareholder misrepresents the value of the stock to another shareholder of a close corporation, the first shareholder may be liable to the other for breach of a fiduciary duty to the individual, but not to the corporation. (See *Illinois Rockford Corp. v. Kulp* (1968), 41 Ill. 2d 215, 222-23, 242 N.E.2d 228.) A director's usurpation of a corporate opportunity, on the other hand, breaches a duty to the corporation, not to the individual shareholders, who can only share in the corporation's recovery from the director. See *Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 444 N.E.2d 549.

Daniel alleged that Lerner and Breen breached fiduciary duties by paying themselves excessive salaries, paying too much in attorney fees, and paying FCS $10 million for its programs and services when DIA could have obtained the same programs and most services from FCS for $1. The chancery court found that Daniel failed to allege any viable claims for breach of a fiduciary duty to himself personally, although the allegations could support a finding of a breach of fidu-

ciary duty to the corporation. The claims tried all involved injury to Daniel only in his status as stockholder. Daniel, like the appellant in *Bio-Scientific Clinical Laboratory, Inc. v. Todd* (1986), 149 Ill. App. 3d 845, 850-51, 501 N.E.2d 192, failed to allege adequate grounds for finding a breach of a fiduciary duty to him individually. Daniel has not shown that the manifest weight of the evidence mandates rejection of Joyce's evaluation of Daniel's right to appeal from the chancery court order granting summary judgment dismissing seven of the eight counts of Daniel's complaint.

Joyce found that the present value of Lerner and Breen's offer of $4.7 million to be paid over 10 years equalled or exceeded the sum of the present values of Daniel's DIA shares, his derivative claim, and his right of appeal. Especially in light of Daniel's admitted inability to support his children, the court ordered the sale of the assets in the best interests of the children. The court's findings are not contrary to the manifest weight of the evidence and the court did not abuse its discretion by ordering the sale. We affirm the order of March 2, 1994, in docket number 1—94—0829.

Affirmed.

GORDON and T. O'BRIEN, JJ., concur.