DISCIPLINED INVESTMENT ADVISORS, INC., *et al.*, Plaintiffs-Appellees, v. DANIEL J. SCHWEIHS, Defendant-Appellant and Counterplaintiff-Appellant (Financial Computer Services, Inc., *et al.*, Counterdefendants-Appellees).

First District (5th Division)    No. 1—94—2585

Opinion filed May 5, 1995.

Peter M. King and William H. Jones, both of Canel, Davis & King, of Chicago, and J. Douglas McCalla and Roy A. Jacobson, Jr., both of Spence, Moriarity & Schuster, of Jackson, Wyoming, for appellant.

Lionel G. Gross and Jeffrey P. DeJong, both of Altheimer & Gray, and Terry M. Grimm and Jennifer J. Demmon, both of Winston & Strawn, both of Chicago, for appellees.

JUSTICE McNULTY delivered the opinion of the court:

Disciplined Investment Advisors, Inc. (DIA), sued Daniel Schweihs in chancery court and Schweihs countersued around the time that he petitioned for divorce from his wife, Melinda. The domestic relations court found that Daniel's interest in the countersuit was a marital asset, and the court ordered sale of the asset to Daniel's opponents in the chancery litigation, in effect ordering a settlement of the case. Daniel appeals from the order for sale of the asset in *In re Marriage of Schweihs* (1995), 272 Ill. App. 3d 653, which we decide in a separate opinion. The chancery court stayed proceedings pending the outcome of the appeal of the domestic relations case, and Daniel appeals from the stay order. We find that the chancery court did not abuse its discretion by staying proceedings pending the divorce appeal.

In 1984 Eugene Lerner and William Breen hired Daniel to sell the services of a corporation they owned, Financial Computer Services, Inc. (FCS), which recommended investments for its clients. Later that year Daniel's wife, Melinda, gave birth to their second child.

In January 1986 Daniel, Lerner and Breen agreed to form an investment management corporation, DIA, with Daniel owning 100 shares and FCS owning the remaining 200 shares. Under the agreement DIA would pay half of its gross revenues to FCS as compensation for its services and products, especially for the continued work of Lerner and Breen in revising, updating, and creating new computer programs for investment selection. The other half of the revenues were to pay expenses, with the remainder "payable to Schweihs as compensation for his services." This arrangement left no sum for earnings, and therefore the parties made no provision for dividends.

The agreement also provided:

"DIA has an option to purchase for the sum of $1.00 the programs developed by FCS and used by DIA in its money management business, but excluding the historical data base."

On April 21, 1988, Lerner and Breen voted to terminate Daniel's employment with DIA. DIA and FCS sued in chancery court to enjoin Daniel from telling employees of DIA what duties to perform and from telling DIA's clients that he represented DIA. Daniel countersued FCS, Lerner and Breen for breach of contract, unjust enrichment, malicious interference with business relations, breach of fiduciary duty to Daniel, and, in a shareholders' derivative count, for breach of directorial duties to DIA.

Daniel petitioned for divorce from Melinda in November 1989. He admitted that he and Melinda owned marital property including

their home, bank accounts, the DIA shares and a chose in action, the interest in the DIA litigation. Daniel admitted that he had a master's of business administration degree, and he earned $100,000 in 1986, $564,000 in 1987 and $293,000 in 1988 before DIA fired him.

Melinda sought temporary child support and maintenance, alleging that she last worked outside the home in 1980, when she earned $10,000 a year. She supported the motion with her affidavit which itemized her expenses of $9,800 per month, including $3,600 for mortgage, taxes and utilities, $730 for food, and more than $1,000 for clothing, education and other expenses exclusively for the children. Daniel responded that he could not earn a substantial living and provide support for Melinda and the children. He alleged that Melinda controlled a bank account with sufficient funds to support the children and he had no employment. He asked the court to order Melinda to sell the family home and find work.

Following a hearing for which no transcript or bystander's report is included in the record on appeal, the trial court found the children needed $2,300 per month in support from both parents. Without determining final allocation of the bank accounts, the court ordered Melinda to use $1,800 each month from the account under her control, and the court ordered Daniel to pay Melinda $500 from the marital bank account under his control, to meet the needs of the children.

In July 1990, after months of negotiations, La Salle National Bank offered to buy Daniel's stock in DIA for $1 million and to loan DIA another $4.2 million to be used to settle Daniel's counterclaim, on condition that Lerner and Breen commit themselves to long-term employment contracts with DIA. Lerner and Breen each agreed to add $1 million to the offer for settlement, giving Daniel the option of recovering $7.2 million if he would surrender his shares and all claims against DIA, FCS, Lerner and Breen. Daniel ultimately rejected the offer and the attorney who had represented him in the DIA litigation and negotiations withdrew.

Melinda received Daniel's tax refund check for 1988 and she moved for an order directing Daniel to sign the check over to her to pay for child support. Following a contested hearing, the court ordered Daniel to endorse the check to Melinda.

Daniel's mother, Veronica Schweihs, died in December 1990, leaving her four children an estate worth more than $400,000. That same month the Internal Revenue Service took the balance of the marital bank account under Daniel's control to cover his unpaid taxes from 1989.

Daniel petitioned for modification of the order for child support,

stating that he had no income and no liquid assets. He did not allege any change in the needs of his children. Following a contested hearing, the court ordered Melinda to take out $2,300 per month from the marital funds under her control to meet the children's needs.

In July 1991 Melinda moved to compel Daniel to sell his stock and settle his lawsuit, and for "further relief as equity may require." She said her bank account held only $2,000 and she would soon have no resources from which to support the children.

Daniel moved to strike the motion to compel sale and settlement. He did not allege any change in the children's needs or Melinda's resources, but in his affidavit he said the support Melinda sought "simply is not available."

At the hearing on the motion to compel sale, held with notice on August 12, 1991, the court said:

"I have read what you have plead[ed] and argued in your motions and I am ready to rule on that basis; but if you have anything that is not contained in the motions or in the arguments contained therein that you wish this court to be advised of, I will give you the opportunity to address those."

Daniel did not seek to present any witnesses, nor did he argue that the children's needs had changed or that the parties had resources of which the court was unaware.

The court found that the parties' assets, including the DIA shares and litigation, should be liquidated to provide child support, but the court held that as a necessary preliminary to an order for sale of the assets, it needed to order child support from the party controlling the assets. The court said:

"[I]f Daniel exhibits a failure to pay child support as ordered on a repeated basis which would be two occasions, then this court may seize, impound, escrow any asset belonging to Mr. Schweihs, which would include his interest in [his mother's] estate as well as his interest in [the DIA litigation]."

The court accepted as true Daniel's allegations that he had no employment and no other assets of value, and Melinda's uncontested sworn statements that she had no new assets, and the bank account which had provided child support was exhausted. The court said: "In view thereof the order of support of approximately $2,300 a month then should be made *** the obligation of Daniel." Daniel objected that the parties had not presented for hearing a motion to modify child support, and he was unemployed. The court answered that he had assets which could provide for the children's needs.

On August 15, 1991, the chancery court entered judgment in favor of DIA on one count of its complaint against Daniel, finding

that DIA did not breach its contract with Daniel by terminating his employment in 1988. On the basis of this ruling, the chancery court later dismissed seven of the eight counts in Daniel's counterclaim, leaving for trial only the shareholders' derivative claim against Lerner and Breen for breach of their fiduciary duties to DIA.

Melinda subsequently filed a petition for a rule to show cause based on Daniel's failure to pay the child support ordered on August 12, 1991. The divorce court ordered Daniel to

"execute and deliver to Respondent's counsel on or before December 2, 1991 an assignment of Petitioner's interest in the estate of Veronica A. Schweihs to Respondent Melinda Schweihs so that it can be used for the care, support and maintenance of the children of Daniel and Melinda Schweihs."

The court later assigned the case to Judge James Donegan because the judge who had heard the case theretofore transferred out of the domestic relations division. On December 4, 1991, Daniel moved to declare the August 12 order void and to reduce child support because he "had neither the funds nor the income to pay [the] support" ordered. He did not allege any change in the children's needs or Melinda's resources. He did not assign his interest in his mother's estate to Melinda. The court continued the motion to modify.

Melinda moved for the appointment of an independent attorney for the children to determine "the value of the claim and the pending law suit" against FCS, DIA, Lerner and Breen. In granting the motion, the court said:

"Edward Joyce is appointed attorney for the estate of the minor children. His role is to determine the value of Daniel's interest in his pending litigation with DIA and he is given full authority to determine the value and he shall submit a report to this Court concerning his findings."

Daniel received a dividend of $20,000 from DIA for 1992, and Melinda petitioned for an order directing Daniel to turn over the funds in payment of his child support arrearage. The court ordered Daniel to give Melinda $15,000 and to keep $5,000 in trust pending further order of the court. The probate court completed distribution of Veronica's estate and Daniel received very little because of his prior use of funds from the estate. Melinda sold the family home in early 1993 and used the $20,000 remaining after paying off the mortgage to pay off debts incurred for living expenses.

Judge Everette Braden tried the shareholders' derivative claim remaining in the DIA litigation on 12 trial days from March 2, 1993, to June 18, 1993. Daniel contended that Lerner and Breen wasted

DIA's corporate assets by paying FCS half of DIA's gross income and by paying themselves $250,000 a year for their efforts to sell DIA's services. Daniel claimed that their work was worth no more than $150,000 per year.

Daniel claimed that Lerner and Breen violated their duties to DIA by failing to exercise the option to purchase FCS's programs for $1. Daniel argued that if the option were exercised, DIA would not need FCS's services, so it could save all the payments DIA agreed to make to FCS when the parties formed DIA. Lerner and Breen testified that they had constantly revised old programs and added new programs to keep DIA competitive, and without their work for FCS altering the programs, DIA's programs would be obsolete in one or two years. Daniel claimed that the $1 option gave DIA the right to the programs developed by FCS even after the exercise of the option, so DIA could remain competitive by paying FCS the $1 under the option for all of the programs and most of the services for which Daniel had agreed to pay FCS half of DIA's revenues, as stated in another clause of the agreement which included the $1 option.

Daniel presented evidence that DIA paid more than $2 million in attorney fees from 1988 through 1992, and Lerner and Breen did not adequately review the charges. Lerner and Breen presented detailed testimony showing the work done on various legal problems, including two tax audits and the DIA litigation. Daniel asked the court to order Lerner and Breen to return $16.3 million to DIA, including $1.4 million plus interest for the overpayment of their salaries, another $1.4 million plus interest for the overpayment of attorney fees, and $10.1 million plus $2.6 million in interest for payments to FCS. The parties submitted post-trial briefs on July 29, 1993, and Judge Braden took the matter under advisement.

FCS offered to pay Daniel a total of $4.7 million to settle the lawsuit and purchase Daniel's stock. In September 1993 Joyce, the attorney appointed to evaluate the DIA litigation, petitioned for authorization to accept the offer for the counterclaim. Joyce included a 10-page report outlining his reasons for believing the settlement offer fair. Daniel moved to dismiss on grounds that the court appointed Joyce attorney for the estate of the children and the children had no estate. Daniel also argued that the court lacked authority to adjudicate rights to the counterclaim because it had not entered a judgment dissolving the marriage. Daniel admitted that the primary remaining assets of the marital estate were the DIA stock and litigation.

The court allowed Joyce a few days to respond to Daniel's motion to strike his petition. FCS's attorney said Judge Braden was prepared

to rule on the counterclaim within those few days, and the offer for which Joyce sought approval would lapse once Judge Braden ruled. Judge Donegan suggested the parties could seek a continuance from Judge Braden. DIA's attorney promptly requested a continuance from Judge Braden, who granted the continuance over Daniel's objection.

Joyce responded to Daniel's motion to strike by noting that he had worked on evaluating the DIA litigation for two years before Daniel raised any question concerning the language appointing him attorney for the estate of the children. Joyce requested an order appointing him attorney for the children *nunc pro tunc* the date of his initial appointment. Daniel answered that the court could enter a *nunc pro tunc* order only to reflect what it originally intended to do, and the court had intended to appoint an attorney for the (nonexistent) estate of the children.

Also in response to Daniel's motion to strike the petition to authorize settlement, Melinda moved for bifurcation and entry of judgment dissolving the marriage without finally disposing of all other issues in the divorce.

The court heard the motion to amend the appointment and the motion for bifurcation on December 7, 1993. The court found that Daniel in his divorce petition alleged sufficient grounds for dissolution, as had Melinda in her cross-petition. The court also accepted Daniel's statements that the principal assets of the marital estate were his DIA shares and litigation. The court held that the best interests of the children required bifurcation and disposition of assets to provide child support.

The court also appointed Joyce attorney for the children *nunc pro tunc* the date of the initial appointment. The judge reminded Daniel that he appointed Joyce "because the Court perceived him to be very well-learned in the Chancery Division," and the court needed to know "whether it would be in the best interests to have both children and Mrs. Schweihs accept [FCS's] offer." The court reiterated in the *nunc pro tunc* order that Joyce was appointed only for valuing the principal marital assets, and not for issues concerning custody or visitation.

The court heard Melinda's testimony in support of her petition for dissolution, and Daniel presented no contrary testimony, so the court entered an order dissolving the marriage. The court found no just reason to delay enforcement or appeal and Daniel appealed.

On Melinda's unopposed motion, the court classified the DIA shares and litigation as marital property. The court heard Joyce's motion for approval of the proposed sale on January 19 and 20, 1994.

Daniel's attorney for the DIA litigation submitted comments on the proposal to the trial court, and Judge Donegan also accepted into evidence the entire record of the DIA litigation and Price Waterhouse's report appraising the stock. Joyce presented financial statements of DIA for 1988 through 1993 and letters summarizing prior offers and the present offer. Joyce sought permission to accept the offer of $2.2 million plus $250,000 per year for 10 years in exchange for the DIA stock and litigation. Lerner and Breen agreed to pay Melinda $100,000 per year during the pendency of the expected appeal, and to make $50,000 available for appellate legal fees, with those sums to come out of the $4.7 million total.

Joyce called himself as a witness to describe what he did to evaluate the chose in action. Daniel objected that because Joyce was attorney for the children, he could not testify on behalf of their petition. The court overruled the objection. Daniel objected that Joyce had not disclosed himself as an expert. The court said it appointed Joyce effectively as the court's witness to evaluate the litigation, and Daniel had been aware of the purpose of the appointment for two years.

Judge Donegan offered to continue the trial to give Daniel a chance to examine and prepare cross-examination concerning Joyce's notes and the documents on which he relied in evaluating the case. Daniel objected, saying he was prepared for trial immediately. He asked for only 10 minutes to peruse the documents. The court granted his request. Daniel did not seek an opportunity to depose Joyce.

Joyce testified concerning his background as a litigator and an accountant, and concerning his work in complex commercial litigation, especially involving closely held corporations. To evaluate the DIA litigation, he spoke with attorneys for all the parties, reviewed the Price Waterhouse report and financial statements, and discussed the documents with another accountant. He also reviewed the pleadings and rulings, especially the summary judgment on seven of the complaint's eight counts. He concluded that although the judgment was harsh, an appeal was not likely to succeed and had little value. He pointed out that even if the appeal succeeded Daniel would win only a new trial some years later, and at the new trial Daniel might recover less than the offer, or even nothing at all.

Joyce testified that he considered Daniel's request for relief in his post-trial motion, along with his claim for subsequent damages, to be a maximum value for the lawsuit. Daniel claimed that Lerner, Breen and FCS owed DIA about $18 million, including damages occurring after the trial. If they made such repayment, Joyce determined that DIA would pay more than 40% in taxes on that sum, and then if

Daniel convinced the court to order a dividend of the remaining earnings, he would receive one-third of that distribution. Joyce estimated that maximum amount at $3.2 million, from which Daniel would need to pay his lawyers' 40% contingency fee.

In evaluating the DIA shares, Joyce observed that the corporation had three principal assets: Lerner, Breen, and the stock selection software they developed. Since neither Breen nor Lerner had any long-term contractual commitment to work for DIA, he could not count on them to remain assets of DIA if they were not motivated to continue working for DIA. Without Lerner and Breen, DIA would be worth only its disposable assets, including the computer programs DIA could acquire when Lerner and Breen left. He found that without the work of Lerner and Breen updating existing programs and adding new ones, the current programs were worth very little. Since the corporation owned no assurance of the continued work of Lerner and Breen, its book value provided a good approximation for its actual value. Joyce said DIA's book value was about $1.2 million, so Daniel's shares were worth about $400,000.

Joyce admitted that United Asset Management (UAM) offered $16 million for all the shares of DIA if Lerner and Breen agreed to continue working there for 10 years, but when asked what it would offer if Lerner and Breen resigned a few months after the sale, UAM answered, "Zero."

The Price Waterhouse report stated that Daniel's shares were worth about $5.5 million. Price Waterhouse first used a discounted cash flow approach, applying DIA's historic average tax rate of approximately 1.5% to its historic average cash flow. Joyce testified that if income flowed into DIA in a form in which DIA could distribute it to Schweihs as dividends, the tax rate would exceed 40%, and therefore Price Waterhouse overstated net cash flow and value by at least that percentage. Also, Price Waterhouse projected cash flows assuming that Lerner and Breen would take no salary from DIA, and Joyce thought this unreasonably overstated cash flows and value.

Using a market comparable approach, Price Waterhouse found that DIA was worth $13.8 million, so Daniel's shares were worth $4.6 million. Joyce believed that DIA's value was not comparable to the publicly traded corporations on which Price Waterhouse based this valuation, and the misleading comparisons far overstated the stock's value.

Moreover, both the market comparable approach and the cash flow approach assumed that DIA would continue to work as it had in the past, which would be the case only if Breen and Lerner continued to devote their primary efforts to the corporation. If Daniel won his

lawsuit, as Joyce assumed in evaluating the suit at $3.2 million, FCS would receive no payments from DIA and Lerner and Breen would receive only their salaries, which, if Daniel won his lawsuit, would be only $150,000 per year, plus after-tax dividends paid by DIA to FCS. At that rate of payment, a mere fraction of the amount Daniel agreed Lerner and Breen should receive in the agreement creating DIA, Lerner and Breen could well decide that they no longer wished to work for DIA. Without their work, DIA's cash flow and, therefore, the value of its shares, would not approach Price Waterhouse's estimates.

Since DIA had no long-term contractual commitment for the continued work of Lerner and Breen, Joyce concluded that the stock was worth no more than $500,000. With the maximum value of the DIA litigation at $3.2 million, Joyce found that the present value of the income stream guaranteed in the settlement offer gave Daniel reasonable value for his lawsuit and stock. The offer was "somewhat low," but it was the amount defendants, "if they're smart, should offer *** plaintiff[s] so they have a hard time saying 'no.' " Because Daniel did not have a predictable, steady income, Joyce could not count on him to support the children if he did not accept the offer.`

Daniel sought to prove that Don Berland, acting on behalf of Lerner and Breen, tried to force a settlement of the DIA litigation some years earlier, arguing that "prior offer[s] of settlement *** are material to the final offer." The court sustained Joyce's objection. Daniel presented documents and argument, but no witnesses, concerning the value of the DIA litigation and shares.

The court ordered disposition of the stock and the chose in action pursuant to the terms of the offer. Between the time of the hearing and the entry of the order, Lerner and Breen sought to amend the offer to include a promise that Daniel

> "shall not during the period in which he is to receive monies pursuant to the terms of this Order make any legally or equitably actionable statement about any of the DIA parties, DIA products or DIA services."

Daniel did not object to the addition of this language, although he argued that the court should not order the sale for the reasons he advanced at trial. Joyce recommended accepting the offer with the change because the added language was only "an admonition that you should not break the law."

On March 2, 1994, Judge Donegan signed the order mandating sale on the terms of the amended offer and Daniel appealed again.

Judge Braden stayed the DIA litigation pending resolution of the appeals from Judge Donegan's orders, and he denied Daniel's motion for addition of Supreme Court Rule 304(a) language (134 Ill. 2d R.

304(a)) to prior orders for summary judgment on most counts of the counterclaim. Daniel now appeals from the stay order.

FCS argues that we lack jurisdiction to consider the appeal from the interlocutory docket management order; Daniel maintains that we have jurisdiction under Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307(a)(1)). In *People v. Kerr-McGee Chemical Corp.* (1986), 142 Ill. App. 3d 1104, 492 N.E.2d 1003, both the Nuclear Regulatory Commission and the Illinois State court began proceedings on claims that Kerr-McGee had disposed of waste improperly. The State court denied Kerr-McGee's motion to stay the case pending the outcome of the agency proceeding. The appellate court held:

> "Denial of a motion requesting a circuit court to stay its own proceedings is treated as the denial of an injunction, and so is appealable as of right, under Supreme Court Rule 307 [citations]. Thus, this interlocutory appeal under Supreme Court Rule 307 is properly before this court." *Kerr-McGee*, 142 Ill. App. 3d at 1106.

■ Where two courts may be deciding the same issues in related litigation, the principle of comity favors quick appellate resolution of any motion asking one court to stay its proceedings pending the decision of the other court. Thus, our supreme court cited with approval a case in which "an order staying proceedings in a case pending the rendition of judgment in a related case was treated as a reviewable order, notwithstanding the fact that the order used the term 'stay' rather than 'injunction.' " *In re A Minor* (1989), 127 Ill. 2d 247, 260, 537 N.E.2d 292, quoting *Valente v. Maida* (1960), 24 Ill. App. 2d 144, 149, 164 N.E.2d 538.

■ This court has consistently held that a motion requesting a court to stay its own proceedings pending resolution of a related case is in effect a request for an injunction, and a decision either granting or denying such a motion is immediately appealable under Rule 307(a)(1). (*E.g., Chicago City Bank & Trust Co. v. Drake International, Inc.* (1991), 211 Ill. App. 3d 850, 854-55, 570 N.E.2d 765; *Medline Industries, Inc. v. Pascal* (1974), 23 Ill. App. 3d 346, 348-49, 319 N.E.2d 310.) Accordingly, we find jurisdiction pursuant to Rule 307(a)(1).

However, our jurisdiction on appeals under Rule 307 is limited to consideration of only the propriety of the order appealed from. (*Murges v. Bowman* (1993), 254 Ill. App. 3d 1071, 1080-81, 627 N.E.2d 330.) "An appeal under Rule 307 does not open the door to a general review of all orders entered by the trial court up to the date of the order that is appealed." (*Panduit Corp. v. All States Plastic Manufacturing Co.* (1980), 84 Ill. App. 3d 1144, 1151, 405 N.E.2d 1316.) We will not address Daniel's attack on the chancery court's order for summary judgment on seven of the eight counts of his

counterclaim, because that order has no bearing on the propriety of the stay order.

In *Vasa North Atlantic Insurance Co. v. Selcke* (1994), 261 Ill. App. 3d 626, 628-29, 633 N.E.2d 865, this court held:

> "The power of the trial court to stay proceedings is an attribute of its inherent power to control the disposition of cases before it. *** *** A court may *** consider factors such as the orderly administration of justice and judicial economy in determining whether to stay proceedings. [Citation.] The scope of review in an interlocutory appeal from an order granting a motion to stay proceedings is limited to a determination as to whether the trial court abused its discretion in granting the stay."

■ Here, if the chancery court had not stayed proceedings and instead entered findings of fact following trial, the offer for Daniel's DIA shares and litigation would expire. The parties would either proceed through years of virtually inevitable appeals and a possible retrial, with the likely prospect of further appeals, or they would need to begin a new round of bargaining to settle the DIA litigation in light of the new findings and order. By staying proceedings the chancery court permitted the case to reach the quickest possible resolution: if the divorce court's order is affirmed on appeal, the chancery court will face no further litigation. Because the stay order improves judicial economy, we hold that the trial court did not abuse its discretion "when it exercised its inherent power to govern the administration of its own docket." (*Selcke*, 261 Ill. App. 3d at 629.) Therefore, we affirm the stay order.

Affirmed.

GORDON and T. O'BRIEN, JJ., concur.