# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Khan v. BDO Seidman, LLP*, 2012 IL App (4th) 120359

---

| | |
|---|---|
| Appellate Court Caption | SHAHID R. KHAN; ANN C. KHAN; UVIADO LLC; JONCTION, LLC; and LEMAN, LLC, Plaintiffs-Appellants, v. BDO SEIDMAN, LLP; and MICHAEL COLLINS, Defendants-Appellees, and GRAMERCY ADVISORS, LLC; GRAMERCY ASSET MANAGEMENT, LLC; GRAMERCY FINANCIAL SERVICES, LLC; TALL SHIPS CAPITAL MANAGEMENT, LLC; JAY A. JOHNSTON; MARC HELIE; DECASTRO, WEST, CHODOROW, GLICKFIELD & NASS, INC.; FINANCIAL STRATEGY GROUP, PLC; and PAUL SHANBROM, Defendants.–SHAHID R. KHAN; ANN C. KHAN; SRK WILSHIRE INVESTMENTS, LLC; SRK WILSHIRE PARTNERS; SRK WILSHIRE INVESTORS, INC.; THERMOSPHERE FX PARTNERS, LLC; and KPASA, LLC, Plaintiffs-Appellants, v. BDO SEIDMAN, LLP; and MICHAEL COLLINS, Defendants-Appellees, and DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., d/b/a DEUTSCHE BANK; ALEX BROWN; DAVID PARSE; EQUILIBRIUM CURRENCY TRADING, LLC; SAMYAK VEERA; GRANT THORNTON, LLP; GRAMERCY ADVISORS, LLC; JAY A. JOHNSTON; MARC HELIE; and PAUL SHANBROM, Defendants. |
| District & No. | Fourth District<br>Docket Nos. 4-12-0359, 4-12-0360 cons. |
| Filed | October 17, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The stay of proceedings entered by the trial court in an action arising from the consulting agreement between the parties was modified to eliminate the stay until the breach-of-contract claims against some defendants were arbitrated and to continue the stay for the duration of the appeal to the supreme court filed by defendant who prepared plaintiffs' income tax returns, since the breach-of-contract claims based on tax advice and investment advice were specifically disclaimed by the parties' agreement. |

| Decision Under Review | Appeal from the Circuit Court of Champaign County, Nos. 09-L-139, 09-L-140; the Hon. Jeffrey B. Ford, Judge, presiding. |
| --- | --- |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | David R. Deary (argued) and Carol E. Farquhar, both of Loewinsohn Flegle Deary, LLP, of Dallas, Texas, and James D. Green, of Thomas, Mamer & Haughey, LLP, of Champaign, for appellants. |
| | Michael S. Poulos, Andrew R. Gifford, Mark A. Bradford, and Raja Gaddipati, all of DLA Piper LLP (US), of Chicago, and Cary B. Samowitz (argued), of DLA Piper LLP (US), of New York, New York, for appellees. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices Pope and McCullough concurred in the judgment and opinion. |

**OPINION**

¶ 1    The plaintiffs in these two consolidated appeals are Shahid R. Khan and his spouse, Ann C. Khan, along with various partnerships and limited-liability companies that Shahid R. Khan formed, allegedly on the advice of BDO Seidman, LLC (BDO), for the purpose of creating tax shelters. Thermosphere FX Partners, LLC (Thermosphere), is one of the partnerships. (Whenever we refer to "Khan" in the singular, we will mean Shahid R. Khan, because, according to the complaint, he was the one who transacted all the business with BDO and the other defendants.) The only defendants who are parties to these two appeals, the only appellees, are BDO and one of its employees, Michael Collins. (When referring collectively to BDO and its employees named in these actions, we will call them the "BDO defendants.") Plaintiffs have sued BDO, Collins, and other persons and business entities for leading plaintiffs into some flawed "tax-advantaged investment strategies."

¶ 2    Plaintiffs have been before us twice before in this litigation. *Khan v. BDO Seidman, LLP*, 404 Ill. App. 3d 892 (2010) (*Khan I*); *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564 (2011) (*Khan II*). In *Khan I*, we decided which of plaintiffs' claims against the BDO defendants had to be arbitrated pursuant to plaintiffs' written "consulting agreement" with

BDO. We held that only the claims for breach of contract came within the scope of the arbitration clause. *Khan I*, 404 Ill. App. 3d at 895. The Supreme Court of Illinois has denied BDO's petition for leave to appeal from our judgment in *Khan I* (*Khan v. BDO Seidman, LLP*, 239 Ill. 2d 555 (2011) (table)), and the Supreme Court of the United States has denied BDO's petition for a writ of *certiorari* (*BDO Seidman, LLP v. Khan*, ___ U.S. ___, 132 S. Ct. 96 (2011)). Thus, *Khan I* has reached finality in the appellate process.

¶ 3     The appellate process is not yet exhausted in *Khan II*–but first let us recount what *Khan II* is all about. In *Khan II*, we rejected the contention that plaintiffs' claims against Deutsche Bank AG; Deutsche Bank Securities, Inc.; and an accounting firm, Grant Thornton LLP, were barred by statutes of limitations and a statute of repose. *Khan II*, 408 Ill. App. 3d at 566. (We will refer to Deutsche Bank, Deutsche Securities, and their employees as the "Deutsche Bank defendants.") Those three defendants in *Khan II* petitioned the supreme court for leave to appeal. The supreme court granted their petitions and consolidated their appeals. *Khan v. BDO Seidman, LLP*, Nos. 112219, 112221, cons. (Sept. 28, 2011). On March 20, 2012, the supreme court heard oral arguments in the consolidated appeals, and its decision is pending.

¶ 4     On March 14, 2012, on remand from our decisions in *Khan I* and *Khan II*, the trial court granted motions by BDO and Collins to stay the trial court proceedings until (1) the supreme court issued its decision in Grant Thornton's appeal and (2) plaintiffs' claims of breach of contract were arbitrated. Plaintiffs disagree with this stay. They appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010).

¶ 5     We find no abuse of discretion in staying the trial court proceedings until the supreme court issues its opinion in Grant Thornton's appeal. We find an abuse of discretion, however, in staying the proceedings until the claims of breach of contract are arbitrated, considering that after our analysis in *Khan I*, little or nothing of the breach-of-contract claims is left. Therefore, we modify the stay so as to make it last only for the duration of Grant Thornton's appeal to the supreme court. We affirm the trial court's judgment as modified and remand this case for further proceedings subject to the stay–which the trial court, in its discretion, may eventually lift if it finds that Grant Thornton's appeal is not proceeding with sufficient dispatch.

¶ 6                                          I. BACKGROUND

¶ 7     In Champaign County case Nos. 09-L-139 and 09-L-140, plaintiffs brought actions against the BDO defendants; the Deutsche Bank defendants; Grant Thornton, LLP; and other persons and business entities for duping plaintiffs into setting up tax shelters that the Internal Revenue Service (IRS) regarded as abusive and illegal. According to the complaints in the two cases, these tax shelters were designed to follow, at least ostensibly, a two-pronged strategy–"Plan A" and "Plan B," so to speak. First, in Plan A, Khan was to make an "investment," by which, the BDO defendants told him, he stood a good chance of making a profit. It is unclear how much Khan understood about this "investment," but it was a bet with Deutsche Bank on what a certain foreign currency would be worth on a certain date. If Khan lost money in this "investment," he was not to worry, because Plan B would kick in and that very loss would be put to lucrative use. Through some transfers between

partnerships and limited-liability companies specially created for this purpose, Khan would be able to use the "investment" loss as a tax loss, to reduce his federal income tax. Not just one but a series of these tax shelters was created.

¶ 8    Both prongs of this "tax-advantaged investment strategy" were a falsehood, plaintiffs allege. For one thing, the "investments" were designed to ensure that Khan would lose money (and that the broker, Deutsche Bank, would make money), and further, plaintiffs allege, it should have been apparent to anyone with a reasonable degree of competence in tax law that the IRS would disallow the claimed tax losses as a sham–and then impose large penalties for the overdue income tax. The strategies appear to be variations on the "Son of BOSS" plan, which, reduced to its essence, works this way. X pays Y, say, a million dollars. Y pays X a million dollars. X counts the million dollars he paid Y as a tax loss without offsetting it by the million dollars Y paid him. See *106 Ltd. v. Commissioner of Internal Revenue Service*, 684 F.3d 84, 86 (D.C. Cir. 2012). In their complaints in the two cases, plaintiffs raised a variety of legal theories, *e.g.*, fraud, negligent misrepresentation, fraudulent concealment of a cause of action, rescission, an illusory contract, and (as an alternative to the theories of rescission and an illusory contract) breach of contract.

¶ 9    Some of the defendants raised affirmative defenses. The BDO defendants invoked an arbitration agreement between BDO and Khan. *Khan I*, 404 Ill. App. 3d at 894. The Deutsche Bank defendants invoked the statute of limitations in section 13-205 of the Code of Civil Procedure (735 ILCS 5/13-205 (West 2008)). *Khan II*, 408 Ill. App. 3d at 566. Grant Thornton invoked the statute of limitations in section 13-214.2(a) (735 ILCS 5/13-214.2(a) (West 2008)), as well as the statute of repose in section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)). *Khan II*, 408 Ill. App. 3d at 566.

¶ 10    In *Khan I*, we considered the BDO defendants' affirmative defense that all of plaintiffs' claims against them had to be arbitrated.

¶ 11    In *Khan II*, we considered, *inter alia*, the affirmative defenses of the Deutsche Bank defendants and Grant Thornton that plaintiffs' claims against them were time-barred.

¶ 12                    A. The Scope of the Arbitration Clause (*Khan I*)

¶ 13    In preparation for each of the "investments," which were supposed to yield a profit for Khan or, alternatively, a loss that, after being passed through partnerships, would reduce his federal income-tax liability, BDO required Khan's signature on "consulting agreements," each of which contained an identically worded arbitration clause. *Khan I*, 404 Ill. App. 3d at 893, 910. The trial court held that all of plaintiffs' claims against the BDO defendants came within the scope of this arbitration clause. *Id.* at 894.

¶ 14    Plaintiffs appealed, and in *Khan I* we affirmed the trial court's judgment in part and reversed it in part, concluding that, by its terms, the arbitration clause covered only plaintiffs' alternative claims against the BDO defendants for breach of contract. *Id.* at 895. (Justice Turner dissented in part: he was of the opinion that the arbitration clause covered not just the claims of breach of contract but all the claims against the BDO defendants: tort claims and contract claims alike. *Id.* at 920 (Turner, J., specially concurring in part and dissenting in part).)

¶ 15    In our analysis in *Khan I*, two features of the consulting agreement led us to the conclusion that the arbitration clause covered only the claims for breach of contract. (We will refer to "the consulting agreement" in the singular because the consulting agreements were "identical in their germane provisions." *Id.* at 894.) The first feature was the wording of the arbitration clause itself. The arbitration clause said: " 'If any dispute, controversy or claim arises *in connection with the performance or breach of this agreement* and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration ***.' " (Emphasis added.) *Id.* at 911. We observed that, in its wording, this arbitration clause was "more narrow than the typical arbitration clause, such as the one in [*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967)], which referred to ' "any controversy or claim arising out of or relating to this Agreement." ' " *Id.* at 913. The arbitration clause in the consulting agreement between BDO and Khan "contemplate[d] the arbitration of a narrower class of claims–those relating to the performance of the agreement–not claims relating to the agreement." *Id.* at 913-14 (citing *Midwest Window Systems, Inc. v. Amcor Industries, Inc.*, 630 F.2d 535, 537 (7th Cir. 1980)).

¶ 16    The second significant feature of the consulting agreement was the language specifically excluding certain activities from BDO's promised performance. The consulting agreement said: " 'BDO is not in the business of providing investment advice or services, thus, none of the services to be rendered are to be considered as investment advice, and it is understood that the Client is not relying upon BDO for investment advice or services.' " (Emphasis omitted.) *Khan I*, 404 Ill. App. 3d at 914. Also, the consulting agreement said: " 'BDO's Services hereunder do not include, and BDO assumes no responsibility whatsoever for, any legal and/or tax opinions regarding any strategies that may be implemented, and has advised the Client to retain a law firm for legal and/or tax opinions on any strategies or transactions they [*sic*] enter into.' " *Id.* at 897.

¶ 17    Thus, the consulting agreement specifically excluded investment advice and tax advice from BDO's promised performance. Those exclusions were significant for purposes of arbitrability, because, according to the various counts in plaintiffs' complaints, BDO's bad investment advice and bad tax advice (or the bad tax advice of law firms with which BDO was in cahoots) were the proximate causes of plaintiffs' damages. BDO advised Khan that he could make money in the "investments" (*id.* at 895), whereas, in reality, the "investments" were structured so as to ensure that he would lose money (*id.* at 898-99). BDO assured him that if he lost money in the "investments," he could claim tax losses (*id.* at 895), and BDO sent him to supposedly independent but actually compromised law firms to obtain confirmation of this falsehood through " 'pre-wired' " legal opinions (*id.* at 900). Plaintiffs' allegations that BDO gave Khan this bad investment advice and bad tax advice (or that BDO deceptively referred him to coconspiring lawyers, by which BDO became liable for *their* bad tax advice) were outside the scope of the arbitration clause because (1) the consulting agreement specifically excluded those activities from BDO's contractual performance and (2) the arbitration clause covered only claims " 'aris[ing] in connection with the performance or breach of this agreement' " (*id.* at 897). *Id.* at 916, 919. Of all the claims in plaintiffs' complaints, which consisted mostly of tort claims, the arbitration clause covered only those

-5-

for breach of contract. *Id.* at 895. And bad investment advice and bad tax advice could not possibly be a breach of the contract between plaintiffs and BDO, given the disclaimers in the consulting agreement.

¶ 18     B. The Statutes of Limitations and Statutes of Repose (*Khan II*)

¶ 19     In the judgment that we reversed in *Khan II*, the trial court held that the statute of limitations in section 13-205 (735 ILCS 5/13-205 (West 2008)) barred the actions against the Deutsche Bank defendants and that the statute of limitations in section 13-214.2(a) (735 ILCS 5/13-214.2(a) (West 2008)) as well as the statute of repose in section 13-214.2(b) (735 5/13-214.2(b) (West 2008)) barred the actions against Grant Thornton.

¶ 20     We first will recount the trial court's analysis regarding the Deutsche Bank defendants, followed by the reasons we gave in *Khan II* for disagreeing with that analysis. Then we will recount the trial court's analysis regarding Grant Thornton, followed by our reasons for disagreement.

¶ 21     1. *The Trial Court's Analysis Regarding the Deutsche Bank Defendants*

¶ 22     Section 13-205 (735 ILCS 5/13-205 (West 2008)) is a five-year statute of limitations, which applies to actions for common-law fraud and other tortious misrepresentations. *Chicago Park District v. Kenroy, Inc.*, 78 Ill. 2d 555, 560-61 (1980) (quoting then section 22 of the Limitations Act (Ill. Rev. Stat. 1975, ch. 83, ¶ 23)). The statute provides: "[A]ll civil actions not otherwise provided for[ ] shall be commenced within 5 years next after the cause of action *accrued*." (Emphasis added.) 735 ILCS 5/13-205 (West 2008).

¶ 23     Regardless, though, of when a cause of action accrues, the discovery rule postpones the running of the statute of limitations until the date when the plaintiff knows, or reasonably should know, that the injury has been wrongfully caused. *Khan II*, 408 Ill. App. 3d at 596. This is not to say that the statute of limitations waits until the plaintiff knows, or reasonably should know, the *full extent* of the wrongfully caused injury. *Id.* Rather, the statutory period begins running just as soon as the plaintiff becomes aware, or reasonably should become aware, of the existence of *some* wrongfully caused injury. *Id.*

¶ 24     According to the trial court, the earliest harm that the Deutsche Bank defendants wrongfully caused and of which the Khans reasonably should have been aware was the $1,275,000 they paid Deutsche Bank for " 'brokering' " the foreign-currency transactions. *Id.* at 592, 596. Once the Khans became aware, or once they had notice, that the IRS would disallow the claimed losses, it should have been apparent to them that they had been misled into paying this $1,275,000. *Id.* at 596. The court found that when the Khans hired a tax attorney in May 2003 to represent them in an IRS audit, they should have discovered that their payment of the $1,275,000 to the Deutsche Bank defendants had been wrongfully caused, because their tax attorney, in the exercise of due diligence, should have discovered the IRS notices rejecting the type of tax-advantaged "investment strategies" that the coconspiring defendants had foisted on the Khans. *Id.* Because the Khans filed their complaint in July 2009, more than five years after May 2003, the court held that the five-year period of limitation in section 13-205 barred their claims against the Deutsche Bank

defendants. *Id.* at 597. (For purposes of its analysis, the court used what appeared to be the longest applicable statute of limitations. The court ruled out the 10-year statute of limitations in section 13-206 (735 ILCS 5/13-206 (West 2008)) because the court regarded plaintiffs' contract claims as disguised tort claims and, according to case law, one could not lengthen the time for filing suit by dressing up a tort claim as a contract claim. *Khan II*, 408 Ill. App. 3d at 597.)

¶ 25                    2. *Our Disagreement With the Trial Court's Analysis*
                          *Regarding the Deutsche Bank Defendants*

¶ 26    We disagreed with the trial court's analysis regarding the Deutsche Bank defendants because, first, in return for the transaction fees that plaintiffs paid the defendants, plaintiffs were promised either a profit from the "investments" *or*, *alternatively*, a tax loss and, second, regardless of any ominous rumblings from the IRS, plaintiffs were not deprived of their tax loss until the IRS actually took it away from them by imposing an assessment. Presumably, in the contemplation of the parties, the payment of $1,275,000 to the Deutsche Bank defendants would have been worthwhile if, despite the immediate failure of the "investment" (or, rather, because of it), plaintiffs were able to claim a tax loss. See *id.* at 607 ("Until the IRS disallows the loss and, consequently, assesses the deficiency along with the interest and penalties, the fees that plaintiffs paid to defendants are not yet a waste, because plaintiffs have not yet been deprived of the contemplated benefit of their bargain, namely, the alternative benefit of a tax loss."). In short, Plan B was just as acceptable as Plan A. The notices that the IRS sent out to the general public did not deprive plaintiffs of their claimed tax loss. Plaintiffs would not actually lose their tax loss until, in their specific case, the IRS finally and definitively took it away through an assessment or until plaintiffs settled with the IRS–a point we gleaned from *Federated Industries, Inc. v. Reisin*, 402 Ill. App. 3d 23 (2010), and *International Engine Parts, Inc. v. Feddersen & Co.*, 888 P.2d 1279 (Cal. 1995). Those authorities taught that a misadvised taxpayer in plaintiffs' position would not suffer actual damages, and consequently a cause of action would not accrue, until the earliest of two events: (1) the IRS made an assessment against the taxpayer (the final step of the IRS's assessment process, not to be confused with an earlier step, the issuance of a notice of deficiency), or (2) the taxpayer agreed with the IRS to pay additional taxes, penalties, or interest that the taxpayer would not have had to pay but for the tax advisor's bad advice. *Khan II*, 408 Ill. App. 3d at 602. (We should emphasize that, unlike us, the trial court did not have the benefit of *Federated*. The First District issued its decision in *Federated* after the trial court filed its decision.)

¶ 27    In addition to citing and discussing *Federated* and *Feddersen*, we pointed out the danger of an unjust result if an action for bad tax advice had to be filed before the claim was truly ripe. If a taxpayer had to file an action against the allegedly negligent tax advisor before the IRS made an assessment or before the taxpayer agreed to pay the IRS an additional amount, a fiasco could unfold. The plaintiff could win a money judgment against the tax advisor, and then, for whatever reason and against all expectation, the IRS could let the deadline go by for filing an assessment–with the unjust result that the taxpayer would get to keep the tax as

loss well as the money judgment premised on the now-problematic theory that claiming the tax loss had caused the taxpayer pecuniary harm. *Id.* at 601.

¶ 28 The harm from underpaying one's federal income taxes–the hammer–was an IRS assessment or, alternatively, a settlement with the IRS. Requiring the taxpayer to file a claim before that harm happened was tantamount to requiring the taxpayer to file an unripe claim. Consequently, we concluded that the trial court had erred in dismissing the claims against the Deutsche Bank defendants as time-barred. *Id.* at 603. We said:

"Indeed, we hold, as a matter of law, that the actions against those defendants are not time-barred, given the allegations of the complaint. We find no indication in the complaint that more than five years (or even two years) have elapsed since an assessment or settlement with the IRS. Until an assessment or settlement, there was no actual harm and hence no accrual of a cause of action–even if, by May 2003, it had become abundantly clear to Khan that defendants had given him false advice. Negligence without harm does not make a cause of action." *Id.*

¶ 29 3. *The Trial Court's Analysis Regarding Grant Thornton*

¶ 30 a. The Statute of Limitations in Section 13-214.2(a)

¶ 31 The trial court held that the two-year statute of limitations in section 13-214.2(a) (735 ILCS 5/13-214.2(a) (West 2008)) barred plaintiffs' claims against Grant Thornton. Section 13-214.2(a) provides: "Actions based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act, as amended [(225 ILCS 450/0.01 to 32 (West 2008))], or any of its employees, partners, members, officers or shareholders, for an act or omission in the performance of professional services shall be commenced within 2 years from the time the person bringing an action knew or should reasonably have known of such act or omission." 735 ILCS 5/13-214.2(a) (West 2008). The court used the same reasoning regarding Grant Thornton that it used regarding the Deutsche Bank defendants–only the period of limitation for actions against an accounting firm, such as Grant Thornton, was shorter.

¶ 32 b. The Statute of Repose in Section 13-214.2(b)

¶ 33 In addition to holding that the statute of limitations in section 13-214.2(a) barred plaintiffs' claims against Grant Thornton, the trial court held that the statute of repose in section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)) likewise barred those claims.

¶ 34 Section 13-214.2(b) provides as follows:

"In no event shall such action be brought more than 5 years after the date on which occurred the act or omission alleged in such action to have been the cause of the injury to the person bringing such action against a public accountant. Provided, however, that in the event that an income tax assessment is made or criminal prosecution is brought against a person, that person may bring an action against the public accountant who prepared the tax return within two years from the date of the assessment or conclusion of the prosecution." 735 ILCS 5/13-214.2(b) (West 2008).

¶ 35    Plaintiffs' only allegation against Grant Thornton was that it had prepared and signed the federal and state income tax returns for one of the partnerships, Thermosphere, for the year 2000 and that these tax returns had claimed the losses from the "investments." The error had flowed into the individual returns of the partners, the Khans, causing them to underpay their taxes. *Khan II*, 408 Ill. App. 3d at 575-76. Because the Khans, however, did not file their complaint until 2009, the trial court held that the five-year statute of repose in section 13-214.2(b) barred their claims against Grant Thornton. *Id.* at 609.

¶ 36    The trial court interpreted the "[p]rovided" sentence in section 13-214.2(b) as "condensing," rather than lengthening, the five-year period. It appears that, under the trial court's interpretation, if the IRS assessed a deficiency or if the plaintiff were prosecuted for violating a tax law, the plaintiff had *less* than five years after the defendant's act or omission to file suit; the plaintiff had to file suit within two years after the assessment or the conclusion of the prosecution. *Id.* at 610-11.

¶ 37    4. *Our Disagreement With the Trial Court's Analysis Regarding Grant Thornton*

¶ 38            a. The Statute of Limitations in Section 13-214.2(a)

¶ 39    Because the Khans would not suffer any actual harm from the defective income-tax returns until the IRS assessed a deficiency or the Khans agreed to pay the IRS some additional amount in settlement of the IRS proceedings on their individual tax returns for 2000, we held that the statute of limitations in section 13-214.2(a) did not bar the actions against Grant Thornton. Everything we said about "actual harm," in our discussion regarding the Deutsche Bank defendants, "applie[d] with equal force to Grant Thornton." *Id.* at 604.

¶ 40    Even the attorney fees the Khans had incurred in the IRS audit were merely a potential harm until the IRS assessed a deficiency as a result of the errors in the tax returns that Grant Thornton had prepared. *Id.* at 607. Drawing an analogy from an attorney malpractice case, *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 355 (1998), we held: "The attorney fees that plaintiffs incurred in the IRS audit are damages only upon the filing of an assessment by the IRS or only when plaintiffs are forced to settle with the IRS, whichever event comes earliest." *Khan II*, 408 Ill. App. 3d at 609.

¶ 41            b. The Statute of Repose in Section 13-214.2(b)

¶ 42    We disagreed with the trial court that the "[p]rovided" sentence in the statute of repose (735 ILCS 5/13-214.2(b) (West 2008)) shortened the five-year period of limitation in the preceding sentence of the statute. Instead, we interpreted section 13-214.2(b) to mean that, notwithstanding the expiration of the five-year period in the first sentence, the plaintiff might bring an action against the accountant within two years after an assessment. We reasoned:

    "The trial court's interpretation might be more convincing if the statute said that the plaintiff 'shall' bring the action against the public accountant within two years after the date of the assessment. Instead, the statute uses the permissive verb 'may.' The statute says that the plaintiff 'may' bring the action within two years after the assessment–suggesting that notwithstanding the first sentence of section 13-214.2(b),

which says that actions against an accountant are barred five years after the harmful act or omission, the plaintiff has permission to bring the action within two years after an assessment. Permission would be necessary, for purposes of the statute of repose, only if the five-year period in the first sentence of section 13-214.2(b) had expired." *Khan II*, 408 Ill. App. 3d at 611.

In other words, "[p]rovided" was a qualifying word, making an exception to the five-year period by giving the aggrieved taxpayer permission to sue the accountant within two years after the assessment.

¶ 43 Grant Thornton argued, however, that, in order for the "[p]rovided" qualification to be applicable, the accountant had to prepare the *plaintiff's* tax return and the IRS had to make an assessment against the *plaintiff*. *Id.* at 612-13. Because Grant Thornton prepared the income tax returns for Thermosphere instead of for the Khans and because the IRS commenced assessment proceedings against the Khans individually instead of against Thermosphere, Grant Thornton argued that the qualification in section 13-214.2(b) was, by its terms, inapplicable. *Id.* at 613.

¶ 44 We rejected this argument by Grant Thornton because section 13-214.2(b) did not actually say that the return had to be the injured person's return. *Id.* Instead, the qualification in section 13-214.2(b) said: " '[I]n the event that an income tax assessment is made *** against a person, that person may bring an action against the public accountant who prepared the tax return within two years from the date of the assessment ***.' " *Id.* (quoting 735 ILCS 5/13-214.2(b) (West 2008)). The statute said " 'the tax return,' " not "the person's individual tax return." *Id.* We inferred: "The legislature must have been aware that the negligent preparation of a partnership's return [could] cause individual returns to be incorrect and result in assessment proceedings against individuals." *Id.*

¶ 45                                    II. ANALYSIS
¶ 46                           A. Our Subject-Matter Jurisdiction
¶ 47 We first must resolve the question of whether we have subject-matter jurisdiction over these two appeals. On this question, plaintiffs invoke Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010). That rule provides: "An appeal may be taken to the Appellate Court from an interlocutory order of court *** granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction ***." *Id.* An order granting a stay of proceedings is a preliminary injunction, appealable under Rule 307(a)(1). *TIG Insurance Co. v. Canel*, 389 Ill. App. 3d 366, 371 (2009); *Property Management, Ltd. v. Howasa, Inc.*, 14 Ill. App. 3d 536, 539 (1973); *Valente v. Maida*, 24 Ill. App. 2d 144, 149-50 (1960).

¶ 48 Defendants take the position, however, that the trial court's "Order on Motion for Protective Order and Stay Pursuant to Supreme Court Rule 201" (Ill. S. Ct. R. 201 (eff. July 1, 2002)) really is not an injunction but instead is a " 'routine discovery order.' " *Goodrich Corp. v. Clark*, 361 Ill. App. 3d 1033, 1039 (2005). "Discovery orders ordinarily are not subject to interlocutory appeal because they only regulate the procedural aspects of the case before the court." *Id.* The same is true of other "orders properly characterized as 'ministerial' or 'administrative.' " *Id.* at 1039-40.

¶ 49 Hence, just because an order requires parties to do something or to refrain from doing something–for example, just because an order requires parties to refrain from performing discovery–it does not necessarily follow that the order is an injunction. Even though "ministerial" or "administrative" orders, such as discovery orders, impose requirements or prohibitions, they are not injunctions. *Id.* An order is an injunction only if it is the type of order that, traditionally, a court of equity would issue in the enforcement of equitable principles. *In re A Minor*, 127 Ill. 2d 247, 261-62 (1989). The supreme court has explained:

> "Not every nonfinal order of a court is appealable, even if it compels a party to do or not do a particular thing. Orders of the circuit court which can be properly characterized as 'ministerial,' or 'administrative'–because they regulate only the procedural details of litigation before the court–cannot be the subject of an interlocutory appeal. (See *People ex rel. Scott v. Silverstein* (1981), 87 Ill. 2d 167, 171 (stating that discovery orders and subpoenas are not appealable interlocutory orders).) Such orders may be considered noninjunctive because they did not form part of the power traditionally reserved to courts of equity, but, instead, were part of the inherent power possessed by any court to compel witnesses to appear before it and give testimony. (See *JFS v. ABMJ* (1983), 120 Ill. App. 3d 261, 262.) They do not affect the relationship of the parties in their everyday activity apart from the litigation, and are therefore distinguishable from traditional forms of injunctive relief." *Minor*, 127 Ill. 2d at 261-62.

¶ 50 The final sentence of this quotation creates a contradiction by implying that unless an order "affect[s] the relationship of the parties in their everyday activity apart from the litigation," the order does not fall within any of the "traditional forms of injunctive relief." *Id.* The contradiction is this: the supreme court just got through saying, two paragraphs earlier in *Minor*, that a stay of litigation was an injunction (*id.* at 260); but a stay of litigation would not necessarily affect the parties "in their everyday activity apart from the litigation" (*id.* at 262). Regardless of whether a stay has any quotidian effect, a stay is indisputably a "traditional form[ ] of injunctive relief." *Id.*

¶ 51 "The use of injunctions to stay actions at law was almost coeval with the establishment of the chancery jurisdiction." 4 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 1360, at 3248 (1919). In England, the court of chancery could never have built up its equitable jurisdiction without "the instrumentality of the injunction restraining the prosecution of legal actions, where the defendants sought the aid of chancery, which alone could take cognizance of the equities that would defeat a recovery at law against them." *Id.* "Indeed the occasions on which an injunction may be used to stay proceedings at law are almost infinite in their nature and circumstances." 2 Joseph Story, Commentaries on Equity Jurisprudence as Administered in England and America § 1206, at 566-67 (WH. Lyon, Jr., ed., 14th ed. 1918). See also *Chapman v. American Surety Co.*, 261 Ill. 594, 599 (1914); *School District No. 46 v. Del Banco*, 68 Ill. App. 2d 145, 152 (1966).

¶ 52 On the one hand, in the passage from *Minor* quoted above, the supreme court approves of cases holding that stays of litigation are appealable injunctions (*Minor*, 127 Ill. 2d at 260-61 (citing, among other cases, *Valente* and *School District No. 46*)), but, on the other hand, the supreme court implies that, in order for a judicial directive to qualify as an injunction, it must "affect the relationship of the parties in their everyday activity apart from the litigation"

(*id.* at 262). Because it strikes us as improbable that the supreme court, in *Minor*, intended to overrule the line of cases holding that a stay is an appealable injunction (*e.g.*, *Disciplined Investment Advisors, Inc. v. Schweihs*, 272 Ill. App. 3d 681, 691 (1995); *Atkins v. Rustic Woods Partners*, 171 Ill. App. 3d 373, 377 (1988); *Valente*, 24 Ill. App. 2d at 149-50)–especially considering that the supreme court cited *Valente* with approval in that respect (*Minor*, 127 Ill. 2d at 260)–we resolve the apparent contradiction by reaffirming the long-held view that a stay of proceedings is indeed an injunction.

¶ 53   An order could effectively stay proceedings by staying discovery, but, even so, *Minor* and *Silverstein* appear to suggest that such an order would not be an injunction. *Minor*, 127 Ill. 2d at 262; *Silverstein*, 87 Ill. 2d at 171. "[D]iscovery orders *** are not appealable interlocutory orders." *Minor*, 127 Ill. 2d at 262.

¶ 54   The trial court's order in the present case purports to be "pursuant to Illinois Supreme Court Rule 201," a rule entitled "General Discovery Provisions," and defendants insist that the order is nothing more than a discovery order. Rule 201(c)(1), which the trial court quotes in its order, describes the protective orders a trial court may enter in its regulation of discovery. The rule provides: "The court may at any time on its own initiative, or on motion of any party or witness, make a protective order as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression." Ill. S. Ct. R. 201(c)(1) (eff. July 1, 2002). If the court's order in the present case were indeed a protective order pursuant to Rule 201(c)(1), and nothing more, we would lack subject-matter jurisdiction because such a protective order would be a discovery order and the supreme court has flatly said that "discovery orders *** are not appealable interlocutory orders." *Minor*, 127 Ill. 2d at 262.

¶ 55   But is that all the trial court's order is, a protective order pursuant to Rule 201(c)(1)? "The appealability of an order is determined by its substance rather than its form." *Boonstra v. City of Chicago*, 214 Ill. App. 3d 379, 385 (1991). Likewise, the character of a pleading is determined by its content, not its label. *Sarkissian v. Chicago Board of Education*, 201 Ill. 2d 95, 102 (2002). Although BDO's and Collins's motions invoked Rule 201(c)(1), the motions actually sought more than a protective order regulating discovery. As plaintiffs observe in their reply brief, the motions sought "a protective order *and* stay of the instant proceedings," to quote the motions. (Emphasis added.) Accordingly, when the court granted the motions, it did more than enter a "protective order *** denying *** discovery" for the time being (Ill. S. Ct. R. 201(c)(1) (eff. July 1, 2002)); the concluding sentence of the court's order says: "BDO Defendants' (which will include Defendant Paul Shanbrom) Motion for Protective Order *and Stay* is allowed." (Emphasis added.) Thus, the court exercised not only its power under Rule 201(c)(1) to regulate discovery but also its common-law equitable power to stay the entire litigation pending before it. Such a stay is an appealable injunction. Under Rule 307(a)(1), we have subject-matter jurisdiction over these appeals. See *Minor*, 127 Ill. 2d at 261; *Disciplined Investment*, 272 Ill. App. 3d at 691; *Atkins*, 171 Ill. App. 3d at 377; *Valente*, 24 Ill. App. 2d at 149-50.

¶ 56                                   **B. Staying the Cases Until Resolution of**

**Grant Thornton's Appeal to the Supreme Court**

¶ 57                                         1. *Guidance From Federal Case Law*

¶ 58    The parties agree on the standard of review; they agree that (assuming we have subject-matter jurisdiction) we should decide whether the trial court abused its discretion by staying the proceedings. See *Philips Electronics, N.V. v. New Hampshire Insurance Co.*, 295 Ill. App. 3d 895, 902 (1998). They disagree, however, on how much overlap must exist between the BDO defendants' case and Grant Thornton's appeal before a stay of litigation in the trial court is justified. Plaintiffs argue that if some of the defendants in a case file an interlocutory appeal, a trial court would be justified in staying the litigation against the other defendants only if the pending appeal could potentially dispose of *all* the claims against those other defendants, not just some of the claims against them.

¶ 59    Initially, we remark that this argument is counterintuitive. Assume, for instance, that a pending appeal involves 9 of the 10 claims made in the trial court. It would seem strange to argue that a stay is unjustified simply because the appeal cannot dispose of the tenth claim.

¶ 60    Granted, courts deem a stay to be a sound exercise of discretion if the appeal has the potential of being completely dispositive. Plaintiffs cite, for example, *Morrison v. YTB International, Inc.*, Civil No. 08-565-GPM, 2010 WL 1931127, at *1 (S.D. Ill. May 13, 2010) (hereinafter *Morrison*). See Fed. R. App. P. 32.1 ("A court may not prohibit or restrict the citation of federal judicial opinions *** that have been *** designated as 'unpublished[ ]' *** and *** issued on or after January 1, 2007."). According to plaintiffs, *Morrison* stands for the following proposition: "Under Illinois law, a court is within its discretion to stay a case when a ruling–*which may be dispositive of the case at hand*–is pending in that case or in a separate proceeding." (Emphasis in original.)

¶ 61    Actually, when it comes to a stay, *Morrison* says nothing about Illinois law; a stay is procedural, and hence, under the *Erie* doctrine (*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)), "[t]he determination of whether to stay a federal court proceeding is governed by federal law" (*Abdullah Sayid Rajab Al-Rifai & Sons W.L.L. v. McDonnell Douglas Foreign Sales Corp.*, 988 F. Supp. 1285, 1291 (E.D. Mo. 1997)). See *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) ("[F]ederal courts [sitting in diversity cases] are to apply state substantive law and federal procedural law.").

¶ 62    Even under federal law, just because a trial court is, as plaintiffs rightly say, "within its discretion" by staying litigation pending an interlocutory appeal that could dispose of all issues, it does not follow that a court is outside its discretion by staying litigation pending an interlocutory appeal that could dispose of significant issues, though not all the issues. In other words, *Morrison* does not suggest that the potential disposition of *all* issues is the *sine qua non* of a stay. Rather, *Morrison* says: "Typically, an appropriate exercise of a court's discretion to enter a stay is a situation in which a ruling dispositive of a case is pending either in the case in which a stay is under consideration or in a separate matter." *Morrison*, 2010 WL 1931127, at *1. "Typically" does not mean "always," and "*an* appropriate exercise of a court's discretion" is not necessarily *the only* appropriate exercise of a court's discretion. (Emphasis added.) *Id.*

¶ 63 In fact, federal courts have rejected the assertion that the separate proceeding has to be potentially dispositive in order to justify a stay. The Supreme Court has said that the issues in the two proceedings do not have to be "identical." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). And the Ninth Circuit has said: "[A] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which *bear upon the case*. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and *does not require that the issues in such proceedings are necessarily controlling of the action before the court*." (Emphases added and internal quotation marks omitted.) *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983). See also *Lakeland Village Homeowners Ass'n v. Great American Insurance Group*, 727 F. Supp. 2d 887, 897 (E.D. Cal. 2010) ("Since three of [the] [p]laintiff's four claims against [the defendant] are based upon [the appealed issue], [i]t would be a waste of judicial and party resources to proceed with [these] claims while the appeal is pending." (Internal quotation marks omitted.)); *Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1094 (E.D. Cal. 2008) (even though the interlocutory appeal could dispose of only one of the three claims, a stay was worthwhile because "a resolution of the interlocutory appeal regarding the third cause of action in favor of [the] [d]efendants would alter the direction of the current proceedings, and might prompt the filing of an amended complaint"). So, if we take our cue from nonbinding federal authority, the pending interlocutory appeal does *not* have to be potentially dispositive or controlling of all claims in order for the trial court to order a stay.

¶ 64 ### 2. *An Analogy From Illinois Case Law*

¶ 65 Drawing an analogy from our decision in *Shaw v. Citizens State Bank of Shipman*, 185 Ill. App. 3d 79 (1989), we conclude that imposing a stay until resolution of Grant Thornton's appeal to the supreme court was a reasonable exercise of the trial court's discretion.

¶ 66 The facts in *Shaw* are not precisely parallel to those before us, but the factual differences are insignificant and have no tendency to lessen the applicability of *Shaw*'s rationale. In *Shaw*, the plaintiff filed two actions in the Macoupin County circuit court. *Id.* at 80. One action was against a bank, and the other action was against the bank and the owner of a grain elevator. *Id.* In both cases, which the circuit court consolidated, the gist of the plaintiff's complaint was the same. The plaintiff alleged that he and his father, Julius Shaw, had entered into a lease agreement, in which Julius Shaw agreed to lease him a farm. *Id.* The bank, however, had lent money to Julius Shaw, who, in return, had granted the bank a security interest in all growing crops and stored grain on his farm–the same farm he subsequently rented to his son, the plaintiff. *Id.* After the plaintiff, pursuant to the lease agreement, raised crops on the farm, harvested them, and took the grain to elevators, the bank made claims to the elevators that this corn–which the plaintiff, of course, considered to be his corn–was actually the bank's corn under the terms of its security agreement with Julius Shaw (who evidently had defaulted on his loan). *Id.*

¶ 67 The plaintiff's parents, Julius Shaw and Phyllis Shaw, then filed for "relief under chapter

12 of the Bankruptcy Act (11 U.S.C. § 101 *et seq.*),'' but the bankruptcy court dismissed their petition because (1) the bankruptcy court found the lease between the plaintiff and Julius Shaw to be valid and enforceable; (2) given that lease, the Shaws could not have been engaged in a farming operation when they filed their bankruptcy petition; and (3) given that they were not engaged in a farming operation at the time of filing, they were ineligible for relief under chapter 12. *Id.* See 11 U.S.C. § 109(f) (2006) ("Only a family farmer or family fisherman with regular annual income may be a debtor under chapter 12 of this title [(11 U.S.C. §§ 1201 to 1231 (2006))]."); 11 U.S.C. § 101(18)(A) (2006) (to be a "family farmer," the individual must be "engaged in a farming operation"); *Otoe County National Bank v. Easton*, 883 F.2d 630, 634 (8th Cir. 1989) ("[W]e reject the proposition *** that the renting out of land *simpliciter* constitutes 'farming,' and hence by statutory definition, a 'farming operation.' "). The bank, a party to the bankruptcy case, was concerned by the bankruptcy court's finding that the plaintiff and Julius Shaw had a valid lease; the bank regarded that finding as a threat to its asserted security interest in the grain. Therefore, the bank appealed the dismissal of the bankruptcy petition. *Shaw*, 185 Ill. App. 3d at 80.

¶ 68       The plaintiff, however, presented the circuit court with the bankruptcy court's finding, pleading *res judicata*. *Id.* at 81. The bank responded by filing in circuit court a motion to stay the consolidated cases until the federal appellate court issued its decision. *Id.* The bank argued that "the existence and validity of [the] plaintiff's lease with his father [was] a major factual issue in the combined cases, because, for [the] plaintiff to prevail, he [had to] show that the lease for a cash rent [was] valid, thus preventing creditors of his parents from having a lien upon the grain grown upon the land." *Id.* The federal appellate court might set aside the bankruptcy court's finding that the plaintiff and Julius Shaw had a valid lease, and the bank argued it would be unwise for the circuit court to base its own decision on a finding that the pending federal appeal might erase. *Id.*

¶ 69       The circuit court denied the bank's motion for a stay. The court relied on *State Life Insurance Co. v. Board of Education*, 401 Ill. 252, 257 (1948), in which the supreme court said: " 'The rule has been settled that where a judgment in one case has successfully been made the basis for the judgment in a second case, the second judgment will stand as *res judicata*, although the first judgment be subsequently reversed.' " *Shaw*, 185 Ill. App. 3d at 81 (quoting *State Life*, 401 Ill. at 257). Evidently, the court reasoned that because the law would give effect to such conflicting judgments, a stay should not be used to prevent such contradictions from coming into existence in the first place.

¶ 70       We disagreed, relying on our decision in *Wiseman v. Law Research, Inc.*, 133 Ill. App. 2d 790 (1971). We said:

          "This court recognized in *Wiseman*, citing *State Life*, that a judgment of a trial court could be *res judicata* even where that judgment was being appealed. This court also recognized, however, the unfortunate result which could occur where a judgment being appealed in one case is used as a basis for a second case before the appeal is final. If the first decision is subsequently reversed, the second decision, though then erroneous, would be required to stand, and there would be no avenue of relief. To avoid that situation, the *Wiseman* court determined that the final decision in the second case should be delayed until the decision on appeal had been rendered. The court added the caveat

-15-

that the circuit court could determine at a subsequent date whether the appeal was proceeding at a reasonable pace, and if it were not, the stay order could be set aside and the proceedings could continue in their ordinary course." *Shaw*, 185 Ill. App. 3d at 81-82.

¶ 71 In other words, unseemly contradictions between judgments could arise in the following manner. While a circuit court has a case pending before it, another tribunal, in a separate case between the same parties, makes a finding relevant to the case before the circuit court–but a party to that case before the other tribunal appeals. While the appeal from the judgment of that other tribunal is still pending, the circuit court makes a decision in the case before it on the basis of the tribunal's finding. The time runs out for appealing the circuit court's judgment, making that judgment *res judicata*. Then a reviewing court overturns the tribunal's finding–the finding on which the circuit court unfortunately had relied in reaching the judgment that has become *res judicata*. Our point in *Shaw* was that such a fiasco was possible under the law, but it did not have to be inevitable: the circuit court could have, and should have, stayed the proceedings before it until the appeal from the tribunal's judgment was resolved.

¶ 72 The plaintiff in *Shaw* argued, however, that, in his cases pending in the circuit court, a stay was unjustified because the validity of the lease was only one issue in those cases and resolving that issue favorably to him would not yield a judgment; he still would have to prove other elements. *Id.* at 82. We responded:

"We do not agree this is a sufficient distinction to negate application of the *Wiseman* theory. We recognize that an issue decided in another case may be so collateral to the case where a court is requested to give *res judicata* effect to that decision that no stay pending appeal of the earlier case is warranted. But here, where the question in the other case is so significant, the unfairness of denying a party an opportunity to refute a determination of another tribunal which may be determined to be wrong requires the application of the *Wiseman* precedent." *Id.*

¶ 73 We acknowledged that, even if the overlapping issue were significant, a stay was not without its pitfalls. The pending appeal could have dragged on, making the length of the stay unfair and excessively prejudicial to the opposing party. *Id.* Or the appeal could have been frivolous, a ploy to keep *res judicata* at bay. *Id.* Here is how we addressed those concerns:

"The *Wiseman* opinion recognizes that the period of the stay should not be unreasonably long, and if the appeal does not proceed with reasonable dispatch, the stay should be lifted. However, when the record shows that the issue on appeal is significant as here, and no conclusive showing is made that the appeal is frivolous or a sham, *Wiseman* requires the trial court to grant a stay for a reasonable time." *Id.* at 82-83.

¶ 74 Thus, according to *Shaw*, in order for a stay to be justified, the overlap between the case at hand and the pending appeal does not have to be complete such that resolution of the appeal is potentially dispositive; it is necessary only that the two proceedings share a "significant" issue, in contrast to an issue "collateral" to the case at hand. *Id.* at 82. Unless the appeal is clearly frivolous, the circuit court should stay its proceedings for a reasonable length of time, until the appeal resolves the shared significant issue. *Id.* at 82-83. If it turns out that the appeal is lasting too long, the court should lift the stay. *Id.* at 82. See also

*Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 17 (2009); *In re Estate of Barth*, 339 Ill. App. 3d 651, 668 (2003); *Illinois Founders Insurance Co. v. Guidish*, 248 Ill. App. 3d 116, 121 (1993).

¶ 75    It is true that *Wiseman* and its progeny–*Shaw*, *Illinois Founders*, *Barth*, and *Kensington's Wine*–involved separate actions whereas Grant Thornton's appeal to the supreme court is part of, and a continuation of, the same action that is pending before the trial court. Nevertheless, we do not see how this factual distinction weakens the relevance of the *Wiseman* doctrine. There is the same potential for contradictory decisions, since, on remand, the trial court must follow our decision, which the supreme court might afterward reverse. Our decision in *Khan II* is the law of the case, binding on the trial court. See *Kennedy v. First National Bank of Mattoon*, 259 Ill. App. 3d 560, 563 (1994). But, as a practical matter, Grant Thornton's appeal to the supreme court makes our decision in *Khan II* tentative.

¶ 76    In its appeal to the supreme court, Grant Thornton makes good-faith arguments deserving of serious consideration; no "conclusive showing" has been made that Grant Thornton's appeal is "frivolous or a sham." *Shaw*, 185 Ill. App. 3d at 82. The supreme court might agree with Grant Thornton and disagree with us, reversing our judgment in *Khan II*. If, before that possible outcome, the trial court and the parties make decisions based on our (later reversed) decision in *Khan II*, "unfortunate" inconsistencies could arise. *Id.* at 81. Expensive discovery could be conducted on claims, or portions of claims, that the supreme court ultimately holds to be time-barred. Pleadings, motions, and memoranda could be drafted, filed, and argued only for the court and the parties to later find out that these costly and time-consuming efforts are based on incorrect legal premises. Plaintiffs could even win a money judgment premised on our holdings in *Khan II*, and, after the time for appeal has run out, the supreme court could reject some or all of those holdings. Understandably, the trial court did not want to step onto a rug that could be jerked out from under its feet.

¶ 77    To be sure, as plaintiffs point out in their brief, they still might have viable theories of recovery against BDO even if the supreme court agrees with all of Grant Thornton's arguments. In its brief to the supreme court in *Khan v. Grant Thornton LLP*, No. 112223, Grant Thornton argues, for example, that for purposes of the two-year statute of limitations in section 13-214.2(a) (735 ILCS 5/13-214.2(a) (West 2008)), plaintiffs' cause of action against Grant Thornton accrued at the same time it accrued against other coconspirators: when the Khans paid the transaction fees in 2000 or 2001. Even if the supreme court agrees with that argument, plaintiffs might still have the argument that BDO committed fresh torts, and fraudulently concealed their causes of action, by subsequently misleading them in the IRS audit in 2003.

¶ 78    So, like the trial court, we agree it is unclear that a supreme court decision entirely favorable to Grant Thornton would dispose of all of plaintiffs' claims against the BDO defendants. But the test is whether the supreme court's decision would be significant to the litigation against the BDO defendants, not whether it would be completely dispositive of the litigation (see *Shaw*, 185 Ill. App. 3d at 82; *Mediterranean*, 708 F.2d at 1465), and since Grant Thornton is asking the supreme court to interpret the statute of limitations and statute of repose pertaining to accountants (735 ILCS 5/13-214.2(a), (b) (West 2008)) and to elucidate when a cause of action for bad tax advice accrues, one might reasonably expect that

-17-

the supreme court's decision will have considerable significance for plaintiffs' claims against another accounting firm, BDO. For example, plaintiffs might or might not have to prove fraudulent concealment by BDO, depending on the supreme court's decision in Grant Thornton's appeal. Also, the BDO defendants cannot intelligently conduct their defense, or know how to respond to discovery requests, until they receive final and definitive guidance on (1) when a cause of action for bad tax advice accrues and (2) what is the correct interpretation of the statute of repose in section 13-213.2(b) (735 ILCS 5/13-214.2(b) (West 2008)). These are questions that the supreme court is anticipated to address in Grant Thornton's and Deutsche Bank's consolidated appeals. The trial court did not abuse its discretion by staying the litigation against the BDO defendants until the supreme court answers these questions.

¶ 79        C. Staying the Cases Until the Claim of Breach of Contract Is Arbitrated

¶ 80        The trial court stayed the proceedings not only for the duration of Grant Thornton's appeal to the supreme court but also for the duration of the arbitration of plaintiffs' claims of breach of contract. Plaintiffs contend that imposing a stay until the conclusion of the arbitration was an abuse of discretion and severely prejudicial to them.

¶ 81        Section 2(d) of the Uniform Arbitration Act (710 ILCS 5/2(d) (West 2010)) provides: "Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this Section or, if the issue is severable, the stay may be with respect thereto only." The first part of section 2(d) is expressed in mandatory language: if the proceeding involves an issue subject to arbitration, the whole proceeding "shall be stayed." But then the statute provides an alternative, introduced by the conjunction "or": if the issue subject to arbitration is "severable" from the other issues in the proceeding, the stay "may" apply to that issue alone. In effect, section 2(d) gives the trial court a choice if an issue is within the arbitration agreement but the other issues are outside the arbitration agreement: the court may stay the entire proceeding, or, alternatively, the court may stay the proceeding only with respect to the severable issue that is subject to arbitration. *Kelso-Burnett Co. v. Zeus Development Corp.*, 107 Ill. App. 3d 34, 41 (1982).

¶ 82        Keeping in mind that our standard of review–abuse of discretion–is the most deferential standard of review recognized by law (*In re D.T.*, 212 Ill. 2d 347, 356 (2004)), we do not see how it was "within the bounds of reason" to stay the proceedings until the claims of breach of contract (whatever was left of those claims) were arbitrated (*People v. Ortega*, 209 Ill. 2d 354, 360 (2004)). For the reasons we have explained, we understand and uphold the trial court's decision to stay the proceedings until the supreme court decides Grant Thornton's appeal, but because our interpretation of the arbitration agreement, in *Khan I*, has thoroughly hollowed out the claims of breach of contract, we do not see the logic or usefulness of awaiting the conclusion of the arbitration as well. It is unclear to us that anything is left to arbitrate, given the conduct that the complaints designate as breaches of contract.

¶ 83        There are two cases in the trial court and therefore two complaints, each of which contains a count entitled "Breach of Contract": count IX in Champaign County case No. 90-

L-139 and count X in Champaign County case No. 09-L-140. Both of those counts assert, in identical language, that the BDO defendants breached their contract with plaintiffs in the following ways:

"These Defendants breached their obligations under the oral and/or written contracts with the Plaintiffs, which caused damages to the Plaintiffs. For instance, Defendants marketed and sold the illegal and abusive tax shelters to Plaintiffs. The Defendants then implemented these illegal and abusive tax shelters for Plaintiffs. The Distressed Debt Strategies were not legal tax-advantaged investment strategies as Defendants promised Plaintiffs they would receive and which Plaintiffs bargained for. Certain of Defendants assisted in the preparation of Plaintiffs' tax returns, signed Plaintiffs' tax returns and advised the Plaintiffs to sign and file the tax returns using the losses generated by these illegal and abusive tax shelters."

¶ 84    In the paragraph quoted above, plaintiffs refer to "oral and/or written contracts," but the consulting agreement contains a merger clause, providing as follows:

" 'This Agreement sets forth the entire agreement between the parties with respect to the subject matter herein, suspending all prior agreements, negotiations or understandings, whether oral or written, with respect to such subject matter. This Agreement may not be amended or modified except in writing signed by duly authorized representatives of the Client and BDO.' " *Khan I*, 404 Ill. App. 3d at 898.

¶ 85    The " 'subject matter' " of the consulting agreement includes " 'investment advice or services' " and " 'legal and/or tax opinions regarding any strategies that may be implemented.' " *Id.* at 897. These areas of endeavor are " 'subject matter' " of the consulting agreement in that BDO specifically disclaims them as part of its contractual performance. *Id.* at 898. Because the consulting agreement disclaims these services as part of BDO's promised contractual performance, these services are outside the scope of the arbitration clause, which covers only " 'any dispute, controversy or claim aris[ing] in connection with the performance or breach of this agreement' " (*id.* at 913). *Id.* at 918, 919. Given the merger clause, it is difficult to see how plaintiffs could have some other, oral contract with the BDO defendants regarding investment advice or tax advice. According to the merger clause, any subsequent agreement regarding this subject matter would have to be in a writing signed by the contracting parties, and we are aware of no such writing.

¶ 86    So, insomuch as plaintiffs seek to recover from the BDO defendants for bad investment advice, they evidently will have to do so on some theory other than breach of contract, since the written contract says that investment advice and investment services will not be part of BDO's promised performance. That is why bad investment advice is outside the scope of the arbitration clause.

¶ 87    Likewise, insomuch as plaintiffs seek to recover from BDO for bad tax advice, it is unclear how they could do so under a theory of breach of contract, considering that tax advice is another service that the written contract specifically disclaims. The contracting parties not only exclude tax advice from being part of BDO's promised performance, but they agree that insomuch as BDO gives tax advice, such advice is a tentative suggestion that plaintiffs are obliged to validate by consulting a lawyer. It would seem that the only way

-19-

plaintiffs could recover from the BDO defendants for bad tax advice would be on some theory of tort based on BDO's conduct in steering plaintiffs to lawyers having prior agreements with BDO to issue bogus legal opinions. *Id.* at 919.

¶ 88　　In sum, given our analysis in *Khan I*, bad investment advice and bad tax advice are excluded from the breach-of-contract claim, because, as the parties stipulated in their integrated agreement, which could be modified only in writing, investment advice and tax advice were *not* part of BDO's agreed-on performance. Those theories, which are the meat of plaintiffs' case–if not the hide, hair, bones, and nails, too–are relegated to the realm of tort or some realm other than contract, as the trial court seemed to recognize when it refused to allow plaintiffs to present their tort claims as contract claims for purposes of statutes of limitations.

¶ 89　　What is left, then, of the claims of breach of contract? Or, to ask the question differently, what is left to arbitrate? We do not know. In *Khan I*, we intended to proceed cautiously; we left the door open in case the parties could think of some alleged breach of contract to arbitrate (plaintiffs say "[f]or instance" when listing the breaches of contract in their complaints). If indeed anything is left under the heading of breach of contract, it would seem relatively insignificant and "collateral" to the central allegations of bad investment advice and bad tax advice. See *Shaw*, 185 Ill. App. 3d at 82. Therefore, while we find that the trial court was well within its discretion to stay the proceedings until the supreme court decided Grant Thornton's appeal, we conclude the court abused its discretion by staying the proceedings against the BDO defendants until the breach-of-contract claims were arbitrated, given that those claims are collateral at best.

¶ 90　　　　　　　　　　　　III. CONCLUSION

¶ 91　　For the foregoing reasons, we affirm the stay as modified so as to last only for the duration of Grant Thornton's appeal to the supreme court, not for the duration of the arbitration.

¶ 92　　Affirmed as modified.